**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PARIS L. JAMES,** | : | |
| **Plaintiff** | : | **No. 1:21-cv-01069** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **JOHN WETZEL, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Pro se Plaintiff Paris L. James ("James") is currently proceeding on claims under 42 U.S.C. § 1983 against (1) Defendant Christopher Belles ("Belles") for retaliation in violation of the First Amendment to the United States Constitution, (2) Defendants Correctional Officer DiNapoli ("DiNapoli") and Sergeant Green ("Green") for violations of the Eighth Amendment, and (3) four John Doe correctional officer Defendants for violations of the Fourth Amendment. James also asserts claims for violations of the Pennsylvania Constitution against Defendants.

Currently before the Court are Defendants' motion for summary judgment, James's cross-motion for summary judgment in which he appears to also move for other relief, and James's omnibus response to this Court's Order directing him to show cause why the Court should not dismiss his claims against the John Doe Defendants due to his failure to name them during discovery, in which he also asserts a motion to compel discovery and requests other forms of relief. For the reasons set forth below, the Court will: (1) deem withdrawn James's motion to compel; (2) dismiss with prejudice James's remaining claims against the John Doe Defendants for James's failure to name/identify them; (3) deem withdrawn James's cross-motion for summary judgment; (4) deem withdrawn any other motion possibly contained within James's cross-motion for summary judgment, except to the extent James seeks the appointment of counsel; (5) deny James's motion for appointment of counsel; (6) grant Defendants' motion for

summary judgment; (7) dismiss with prejudice one of James's two First Amendment retaliation claims against Belles under 28 U.S.C. § 1915(e)(2)(B); (8) decline to exercise supplemental jurisdiction over James's state-law claims and dismiss those claims without prejudice to James refiling them in the appropriate state court; and (9) direct the Clerk of Court to close this case.

## I. BACKGROUND

James, a convicted and sentenced state prisoner who is currently incarcerated at Pennsylvania State Correctional Institution ("SCI") Somerset, commenced this action by filing a complaint and an application for leave to proceed in forma pauperis ("IFP Application"), both of which the Clerk of Court docketed on June 17, 2021. (Doc. Nos. 1, 2.) James did not file a certified prisoner account statement as required by the in forma pauperis statute when he filed his IFP Application, see 28 U.S.C. § 1915(a)(2) ("A prisoner seeking to bring a civil action ... without prepayment of fees[,] ... shall submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint ..., obtained from the appropriate official of each prison at which the prisoner is or was confined."); as such, an Administrative Order issued requiring the superintendent at James's then-place of confinement to submit James's certified account statement with the Clerk of Court. (Doc. No. 5.) The Clerk of Court docketed James's certified account statement on June 28, 2021. (Doc. No. 6.)

In his complaint, James named as Defendants: (1) John Wetzel ("Wetzel"), the then-Secretary of the Commonwealth of Pennsylvania Department of Corrections ("DOC"); (2) Thomas McGinley ("McGinley"), the Superintendent at Pennsylvania State Correctional Institution Coal Township ("SCI Coal Twp."); (3) William Nicklow ("Nicklow"), the Deputy

Superintendent at SCI Coal Twp.; (4) Sean Drucis ("Drucis") and Christopher Belles ("Belles"), Security Lieutenants at SCI Coal Twp.; (5) John Doe, a Security Captain at SCI Coal Twp. ("Captain Doe"); and (6) four John Doe corrections officers at SCI Coal Township (collectively, "CO Does"), whom he identifies as John Doe #1 ("CO Doe #1"), John Doe #2 ("CO Doe #2"), John Doe #3 ("CO Doe #3"), and John Doe #4 ("CO Doe #4"). See (Doc. Nos. 1 at 2–5; 1-1 at 2–3.) As for his allegations and legal claims in his complaint, the Court previously described them as follows:

> On the morning of July 17, 2019, [James] was in his cell preparing various legal documents for an upcoming visit to the law library. (Doc. No. 1-1 ¶ 15.) Shortly before he was to receive his pass to the law library, "housing staff" informed him that his time there had been cancelled. [See (id.).] The [CO Does] subsequently appeared at [James]'s cell, at or about 8:45 a.m., and directed [him] to submit to a strip search. (Id. ¶ 16.) [James] complied and informed the officers that he had been in the process of compiling various legal documents for mailing, but that his time in the law library had been cancelled. (Id. ¶¶ 16–18.) [James] alleges that [CO Doe #2 and CO Doe #3] began laughing at him and instructed him to submit to handcuffs, which [James] did. (Id. ¶ 18.) The handcuffs were "unnecessarily applied excessively tight[.]" [See (id.).]
>
> The officers then removed [James] from his cell and placed him in a strip cage, where he was "ordered to comply with strip search[] procedures for a second time[.]" [See (id. ¶ 19). James] complied and again informed the officers that his various documents pertained to his pending civil actions. (Id.) In response, . . . [CO Doe #1] stated that they would "give [James] something to complain about." [See (id. ¶ 20). James] interpreted that statement to "suggest [that he] would be physically harmed or unlawfully placed in the [Restricted Housing Unit ("RHU")], but knew for sure something bad was going to happen" because he had previously been the target of adverse action in retaliation for filing grievances and lawsuits. [See (id.). James] maintains, for example, that since filing a previous lawsuit, Officer Tripp, who had been named as a defendant in that prior lawsuit, retaliated against [him] by directing other corrections officers to deprive [him] of "equal protection of programs [and] privileges[,]" including denying him the inmate phone system, obstructing his access to the courts, and failing to act on his complaints. [See (id. ¶ 21).]
>
> After the second strip search was complete, the [CO Does] handcuffed [James]. (Id. ¶ 22.) The handcuffs were "excessively tight" and caused [James] pain, but the officers refused to loosen them. [See (id.).] The officers took [James] back to his housing unit, but instead of taking him to his cell "to observe the search[,]" they

locked him in the bathroom for half an hour. [See (id.).] The bathroom was extremely hot due to a lack of air circulation, which caused [James] to experience difficulty breathing because of his asthma. (Id.) [James]'s requests for medical treatment, including being provided his inhaler, were ignored. (Id.) His request for the handcuffs to be loosened so that he could use the bathroom was also ignored. (Id.)

Around 11:30 a.m., the [CO Does] left [James]'s cell with multiple boxes and bags of paper. (Id. ¶ 23.) [James] was then released from the bathroom, at which point he observed the "complete destruction of his cell[.]" [See (id.)] (alleging that his "documents were thrown everywhere[,]" that "filings were visually missing[,]" and that documents were "ripped up").) [James] asked the officers to use the video camera to record the condition of his cell and to allow him to examine the boxes of paperwork. (Id.) The officers refused and told [James] that they would take him to the RHU if he continued to complain. (Id.)

The next morning, [James] was walking to breakfast, when he saw . . . Drucis. (Id. ¶ 24.) [James] asked . . . Drucis to go to his cell, which he did, and [James] "showed him the aftermath of the [officers'] retaliatory destruction." [See (id.). James] asked . . . Drucis to "video record the evidence," but [he] refused. [See (id. ¶ 25). James] returned to breakfast and submitted a grievance about the search. (Id.) [James] also submitted a request slip to . . . McGinley, requesting that he order video footage of [his] cell, but "nothing was done." [See (id.).] The following day, on July 19, 2019, . . . Nicklow was conducting rounds on the housing unit, when [James] advised him about what had happened. (Id.) [James] again requested video footage of his cell, but . . . Nicklow denied that request. (Id.)

[James] contends that Defendants' "retaliatory misconduct" forced him to settle a previously filed lawsuit, obstructed him from timely seeking injunctive relief, and prevented him from properly exhausting a retaliatory misconduct issued by . . . Belles, as well as various grievances. [See (id. ¶ 26).] In addition, [James] maintains that he "acted reasonably [and] diligently[,]" that he sought "lawful relief through exhaustion[,]" and that he corresponded with . . . Wetzel and McGinley to make them aware of these issues. [See (id. ¶ 27). James] also maintains that the cell search on July 17, 2019, was the culmination of a series of retaliatory actions, including one instance in which [James]'s "out of state visit" on or about July 6, 2019, was terminated early after [he] had "spoke[n] up about the inability to . . . use the bathroom coupled by [the] fact [that he] had actively been seeking legal representation[.]" [See (id. ¶ 28).]

Based upon these allegations, [James] asserts violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights. (Id. ¶¶ 30-47.) With respect to [James's] claims against Wetzel, McGinley, Dricus, Belles, and Nicklow, he seeks to hold them liable under the First and Eighth Amendments for: (1) being indifferent to the inhumane conditions of his confinement, including the July 17, 2019 cell search; (2) failing to supervise or train individuals; (3) retaliating against him for

> filing grievances and lawsuits; (4) obstructing his access to the courts; and (5) failing to act once he notified them of the destruction of his cell after the search. (Id. ¶¶ 30–37.) [James]'s remaining claims are asserted against the John Doe Defendants. (Id. ¶¶ 38–47.) As for relief, [James] seeks damages, as well as declaratory and injunctive relief. (Id. ¶¶ 48–91.)

See (Doc. No. 24 at 2–5 (internal footnote omitted) (some alterations in original)).

On June 30, 2021, the Court issued an Order which, inter alia, granted James's IFP Application and directed the Clerk of Court to send copies of the complaint and waiver of service forms to Defendants. (Doc. No. 7.) Belles, McGinley, Wetzel, Nicklow, and Drucis waived service (Doc. No. 11), and they later filed a motion to dismiss James's complaint, along with a supporting brief, on September 10, 2021 (Doc. Nos. 14, 15). James, after receiving two extensions of time (Doc. Nos. 16–21), filed a brief in opposition to Defendants' motion on January 4, 2022 (Doc. No. 22).

On June 24, 2022, the Court issued a Memorandum and Order which, inter alia, granted Defendants' motion to dismiss and dismissed James's claims against them without prejudice to him filing an amended complaint within 30 days. See (Doc. Nos. 24, 25). James then filed a motion to appoint counsel and a supporting brief, as well as a motion for an extension of time to file an amended complaint, all of which the Clerk of Court docketed on July 25, 2022. (Doc. Nos. 26–28.) On August 8, 2022, the Court granted James's motion for an extension of time to file his amended complaint and denied without prejudice his motion for appointment of counsel. (Doc. No. 29.)

James filed a motion to stay this action on August 25, 2022 (Doc. No. 30), and the Court issued an Order on November 16, 2022, which, inter alia, denied the motion to stay and granted James an additional extension of time to file an amended complaint (Doc. No. 31). Upon his

motion for another extension of time (Doc. No. 32), the Court granted James an additional extension of time to file his amended complaint on January 20, 2022 (Doc. No. 33).

The Clerk of Court docketed James's amended complaint on February 27, 2023. (Doc. No. 34.) In his amended complaint, James once again named as Defendants the individuals referenced in his original complaint, i.e., Wetzel, McGinley, Nicklow, Drucius, Belles, Captain Doe, and the CO Does. See (Doc. No. 34 at 1–4). He also named the following new Defendants: (1) Richard Little ("Little"), the DOC's former Acting Secretary; (2) the DOC's "Chief Counsel," serving as its "top legal advisor"; (3) Dorina Varner ("Varner"), the DOC's Chief Grievance Officer; (4) Trisha Kelley ("Kelley"), the Superintendent's Assistant at SCI Coal Twp.; (5) Keith Tripp ("Tripp"), the Major of Unit Management at SCI Coal Twp.; (6) Steven Green ("Green"), a Sergeant at SCI Coal Twp.; (7) DiNapoli, another correctional officer at SCI Coal Twp.; (8) Marilynn Noel ("Noel"), the school principal at SCI Coal Twp.; and (9) Bauer, the law librarian at SCI Coal Twp. See (id.).[1]

As for James's factual allegations and legal claims, the Court previously described them as follows:

> [James]'s amended complaint begins by explaining that he was incarcerated at SCI Coal [Twp.] from October 11, 2012, until, approximately, September 9, 2019, when he was transferred to SCI Fayette according to a settlement agreement in "Civil Action No. 14-69 James v. Sauers[.]" [See (Doc. No. 34 at 5)]; see James v. Sauers, No. 1:14-cv-00069 (W.D. Pa. filed March 3, 2014) ("James v. Sauers"). Upon his arrival to SCI Coal Township, he was subject to, inter alia, "inhumane conditions of confinement" and the "deni[al] [of] medical care[.]" [See (Doc. No. 34 at 5).] "[T]hose claims" were exhausted, litigated, and resolved in "1:14-CV-1951, 18-1722, James v. Varano[.]" [See (id.)]; see James v. Varano, No. 1:14-cv-01951 (M.D. Pa. filed Oct. 8, 2014) ("James v. Varano").

[1] The Court has used the newly named Defendants' spelling of their names, rather than the spelling used by James in his amended complaint. See (Doc. No. 38 at 1 (indicating spelling of newly named Defendants' names)).

In seeming connection with James v. Varano, [James] asserts that he suffered retaliation in response to him filing grievances and sending correspondence to . . . Wetzel wherein he sought a transfer and initiation of a "separation" against numerous DOC corrections staff, including . . . Tripp. [See (Doc. No. 34 at 5). James] also asserts that he was subject to "the most extreme and adverse conditions as penalty" for his refusal to "cease litigation" against, presumably, the defendants in James v. Varano. [See (id.).] Despite seeking redress in "2:21-CV-00786-CRE James v. Wetzel" for a breach of the "settlement agreement" and "denial of access to courts[,]" and despite his "current[ ] suffering[,]" . . . Little has failed to take any action. [See (id.)]; see also James v. Wetzel, No. 2:21-cv-00786 (W.D. Pa. filed June 16, 2021) ("James v. Wetzel").[2]

[James]'s amended complaint then delves into various allegations concerning how he spoke with numerous individuals within the DOC about "the conditions" of his confinement and the denial of his access to the Courts. See, e.g., ([Doc. No. 34] at 5–6). Specifically, he asserts that . . . Nicklow, Drucis, McGinley, and Tripp "abused their official office as [c]orrections [o]fficers" and that . . . McGinley, Tripp, Kelley, Varner, and Biscoe (a non-party) were deliberately indifferent and took "no steps to cure the conditions." [See (id. at 6)] (explaining that he "spoke directly with these Defendants[,] sent DC-135A inmate request [forms]" or "forwarded protected correspondence" to them, or that these individuals "reviewed grievance appeals at the time when the conditions remained cruel and unusual")[])[.]

[James] further asserts that, despite requesting "intervention[,]" he "received none[,]" and that, instead, . . . Tripp and McGinley "provided direction to their subordinates" to violate his right to access the courts, for "program eligibility[,]" and "refuge[.]" [See (id.).] In addition, . . . Varner, via the DOC's administrative remedy process, "deliberately ignored" the alleged violations set forth in [James]'s grievances, allowing him to continue to suffer from wrongdoing, as well as the spoliation of evidence. [See (id. at 7).] And, [James] also suggests that, because he had been exhausting his administrative remedies with respect to his various civil actions, . . . Wetzel, Little, Varner, Holmes, McGinley, and Tripp were "each aware but failed to act" or were "beingindifferent [sic] to [his] right to be free from inhumane mistreatment." [See (id. at 8–9).]

In connection with these allegations, [James] states that he was suffering under a "campaign of retaliation and abuse[.]" [See (id.).] In support, he appears to set forth the following examples of such "retaliation and abuse:" on an unspecified date, but sometime after he filed his amended complaint in James v. Varano, . . . Tripp and McGinley denied him the ability to communicate with his family, despite

---

[2] According to the dockets in James v. Wetzel and this action, [James] signed his pro se complaints on the same date (i.e., June 9, 2021). Compare James v. Wetzel, No. 2:21-cv-00786 (W.D. Pa. June 16, 2021), ECF No. 1-2[,] with James v. Wetzel, No. 1:21-cv-01069 (M.D. Pa. June 17, 2021), ECF No. 1-1.

his compliance with the phone call "sign-up procedures[,]" [see] (id. at 7–8); on an unspecified date, but after he filed an unidentified grievance, . . . Tripp and McGinley "conspired and issued a false retaliatory misconduct by . . . Belles")[, see] (id. at 8); and, on unspecified dates and times, Bauer and Noel "repeatedly denied" [him] access to the institution's law library[, see] (id. at 10–11).

From there, [James]'s amended complaint focuses on what appears to be the crux of his pleading—incidents that allegedly occurred on July 6, 2019, and during the two (2) weeks that followed. On July 6, 2019, [James] alleges that he was "denied . . . the basic function of using the bathroom during the course of his out of state visit." [See (id. at 9).] He "waited nearly 24mins to gain access to the bathroom[,]" and he advised "John Doe visiting [o]fficer that [he] intended to submit[ ] a grievance about the exaggerated [and] unreasonable delays[.]" [See (id.). James] explains that this "out of state visitor" was one of the people "enlisted" to post on the internet about [his] complaints of being denied "humane conditions of confinement[.]" [See (id. at 9–10).]

[James] alleges that, less than two (2) weeks later, on the morning of July 17, 2019, he was waiting in his cell to attend the law library so that he could staple, package, and mail a habeas corpus petition concerning his underlying criminal conviction. (Id. at 8, 10.) However, at about 8:45 a.m., the [CO Does] arrived at his cell to conduct an "investigative cell search[,]" during which they ordered [James] to submit to a strip search. [See (id. at 10).] Although [James] complied with their directives, he questioned why he was being subjected to an investigative cell search, and he advised the officers that he had "documentation" in his cell for his active civil and criminal cases. [See (id.)]; see also (id. at 11 (explaining that he "repeatedly directed" their attention to "specific piles" concerning his Section 1983 actions against DOC officials)). The [CO Does] proceeded by verbally harassing [James] and "unnecessarily appl[ying] excessively . . . tight handcuffs[.]" [See (id.).]

[James] was then led out of his cell and taken to the housing unit's foyer, where there is a sergeant's office, and he was subjected to a second strip search, which he asserts was intrusive, unnecessary, and humiliating. (Id. at 12.) During this second search, [James] reiterated to the [CO Does] that his legal documentation was organized in piles in his cell. (Id.) "Essential to [his] notification to" the officers was his "itemized records" pertaining to trial preparations for James v. Sauers. [See (id.).] In support, [James] alleges that . . . McGinley, Tripp, Noel, and Bauer were "well aware" of that trial[, see] (id. at 13), and [James] seems to suggest that the [CO Does] had been directed to subject him to the "retaliatory" and "harassing" search in an effort to cause "governmental interference" and to have [James] "miss" or "file defective civil and criminal petitions[," see] (id. at 13–14).

In addition, [James] asserts that his wrist and arms were in pain because of the tight handcuffs, but he was told, "why don't you resist so we can break your fucking neck." [See (id. at 13).] In response to this threat, [James] requested to see a captain

or a lieutenant. (Id.) [James] was denied this request, and the [CO Does] continued to verbally harass him. (Id. at 14.) [James] was also denied the ability to observe the search of his cell, and, instead, the [CO Does] locked him inside of the inmates' bathroom and kept the handcuffs on him. (Id. at 15.) After half an hour in the bathroom, which was hot, had no vents, and smelled like urine, [James] informed . . . D[iNapoli] and Green[] that he needed his inhaler and had to go to the bathroom. (Id. at 16.) However, . . . D[iNapoli] and Green[] ignored this request and had [James] remain in the bathroom for nearly two (2) hours. (Id.)

Following the investigative cell search, "Defendants" (presumably the [CO Does]) exited his cell with multiple boxes of documents. [See (id.). James] claims that he was not permitted to inventory the contents of those boxes, and he was not issued a property inmate confiscation form for the legal documents that had been confiscated. (Id.) [James] further claims that there was "complete destruction" of his cell, as documents were thrown everywhere, some torn up and some missing, including a civil rights complaint "which named . . . Belles, Tripp, McGinley, Bauer, [and] Noel." [See (id.).] As a result, [James] requested that "video hand held [sic] recordings of the condition of [his] cell" be "produced and preserved[.]" [See (id.).] James] was told, however, that if he complained, he would be taken to "the RHU right now." [See (id.). James] also requested that . . . D[iNapoli] and Green[] write an incident report and document [James]'s DC-ADM 001 claim of inmate abuse, but they refused to do so. (Id.)

Later that evening, [James] completed a DC-ADM 804 inmate grievance concerning the property damage and unlawful confiscation of his legal documentation. (Id. at 17.) And, the following morning on July 18, 2019, around 6:30 or 7:00 a.m., [James] spoke with . . . Drucis and asked him to videotape the "after math [sic] of the retaliatory search" by the [CO Does]. [See (id.).] However, . . . Drucis refused to do so, stating: "why would I help you collect evidence[?]" [See (id.).] . . . Drucis also stated that it was in [James]'s "best interest to stop before things [got worse] for [him]." [See (id.).]

[James] then went to breakfast, and when he returned, he completed a DC-135A form, requesting . . . McGinley to order that video footage of his cell be documented and collected, a request which [James] claims went unanswered. (Id.) And, the following day, on July 19, 2019, [James] spoke with . . . Nicklow, who was completing rounds on the housing unit. (Id.) [James] asserts that he asked . . . Nicklow to, inter alia, document the wrongdoing and have [his] confiscated legal material returned to him. (Id.) [James] does not specify, however, how . . . Nicklow responded to his request. See (id.).

Finally, [James] alleges that, as a result of the July 17, 2019 investigative cell search and the confiscation of his legal documentation, he was "forced . . . to accept the terms of the settlement agreement [in James v. Sauers], including getting transferred" from SCI Coal T[wp. See (id. at 10, 12, 17). James] acknowledges that he was appointed counsel in that case "to assist" with mediation. (Id. at 17.)

> In connection with all of these allegations, [James]'s amended complaint asserts eleven . . . causes of action against Defendants based upon violations of his First, Fourth, Eighth, and Fourteenth Amendment rights, as well as violations of the Pennsylvania Constitution, Article 1, §§ 1, 7, 8, 11, 13, and 20. See (id. at 19–31). For relief, Plaintiff seeks declaratory relief, compensatory and punitive damages, the costs of this suit, the appointment of counsel, and various forms of injunctive relief, including, the United States Marshals collecting "documentation under seal" that is in Defendants' possession, "enjoin[ing] . . . Little and their agents[,]" being certified as a class of one, being provided relief "as a mental health inmate under the [Americans with Disabilities Act ("ADA")][,]" and habeas corpus relief. [See (id. at 22–32).]

See (Doc. No. 54 at 3–9 (internal footnote and some alterations in original)).

Following James filing his amended complaint, the Court issued an Order which, inter alia, required the Clerk of Court to send copies of the amended complaint and waiver of service forms to the newly named Defendants. (Doc. No. 35.) All newly named Defendants other than Bauer returned waivers of service. (Doc. No. 38–39.)[3] Then, on July 5, 2023, all named Defendants other than Bauer (the "Moving Defendants") filed a motion to partially dismiss James's amended complaint along with a brief in support of their motion. (Doc. Nos. 40, 41.)

On August 3, 2023, James filed a motion for an extension of time to file his response to the motion to partially dismiss his amended complaint (Doc. No. 42), which the Court granted on September 11, 2023 (Doc. No. 45). James then filed a motion for a temporary restraining order or preliminary injunction (Doc. No. 46), a brief in support of this motion (Doc. No. 47), a second motion for an extension of time to file a response to the motion to dismiss (Doc. No. 50), and a motion to appoint counsel (Doc. No. 51). The Moving Defendants also filed a brief in opposition to James's motion for a temporary restraining order (Doc. No. 48), to which James filed a "Motion to Show Cause" (Doc. No. 50).

[3] Defendants identified the DOC's "Chief Counsel" as Tim Holmes ("Holmes"). See (Doc. No. 37 at 1).

The Court issued an Order granting James's second motion for an extension of time to file his response to the Moving Defendants' motion to partially dismiss (Doc. No. 52), and the Clerk of Court docketed James's brief in opposition to the motion to partially dismiss on February 6, 2024 (Doc. No. 53). On March 28, 2024, the Court issued a Memorandum and Order which, inter alia: (1) granted the Moving Defendants' motion to partially dismiss the amended complaint; (2) dismissed James's claims against Wetzel, Little, Nicklow, Drucis, Kelley, Varner, and Holmes because he failed to allege their personal involvement in any constitutional violation; (3) dismissed James's First, Fourth, Eighth, and Fourteenth Amendment claims against McGinley, Tripp, and Noel, for the failure to state a plausible claim for relief; (4) struck from the amended complaint James's requests for (a) compensatory damages, (b) damages for violations of the Pennsylvania Constitution, (c) relief under the ADA, (d) relief under an equal protection theory of liability, (e) habeas corpus relief, (f) injunctive relief requiring the United States Marshals to collect "documentation under seal" in Defendants' possession, and (g) injunctive relief as to Little and his agents; (5) denied James's motion for a temporary restraining order or preliminary injunction; and (6) denied without prejudice James's motion to appoint counsel. See (Doc. Nos. 54 at 1, 11–43; 55 at 1, 2). The Court also explained that this action would proceed on only James's (1) Section 1983 First Amendment retaliation claim against Belles for the alleged issuance of a "false retaliatory misconduct"; (2) Section 1983 Fourth Amendment claim against the CO Does based on the two strip searches they allegedly conducted; (3) Section 1983 Eighth Amendment cruel and unusual punishment claim against Green and DiNapoli for allegedly denying James's request for an inhaler and leaving him in a bathroom for nearly two hours; and (4) claims for violations of the Pennsylvania Constitution against Belles, Green, DiNapoli, and the CO Does (collectively, "Defendants"). See (Doc. Nos.

54 at 36; 55 at 2). In addition to the above, the Court also established deadlines for Defendants to file their answer to James's amended complaint, the parties to conduct discovery, and the parties to file dispositive motions. See (Doc. No. 55 at 2).

Defendants filed their answer with affirmative defenses to the amended complaint on April 18, 2024. (Doc. No. 57.) The parties later moved for, and the Court granted, extensions of time to complete discovery and file dispositive motions. (Doc. Nos. 58–61, 67–70, 77.) The Court also ordered James to show cause why the Court should not dismiss his claims against the CO Does due to his failure to identify them during discovery. See (Doc. No. 77 at 5).

Defendants filed their motion for summary judgment, statement of undisputed material facts, and supporting brief on October 6, 2025. (Doc. Nos. 74–76.) James filed a brief in opposition to Defendants' motion for summary judgment on November 17, 2025. (Doc. No. 79.) He also filed a "Motion for Summary Judgment, Memorandum Supplement [sic] Motion[,] Memorandum Law [sic] in Support of Opposition SOF Defendants [sic] TRO Entitlement Special Relief Declaratory Judgment" and a "Memorandum of Law in Support of [His] Motion to Show Cause/and Compel Complete Discovery Response [sic] Production of Documents," with the latter submission appearing to be his response, at least in part, to the Court's Order to Show Cause. See (Doc. Nos. 78, 80).

On November 26, 2025, Defendants filed a motion for leave to file a reply brief in further support of their motion for summary judgment (Doc. No. 82), which the Court granted on the same date (Doc. No. 83).[4] On January 22, 2026, James filed a "Memorandum of Law in Support of Motion for Judgment on the Pleadings." See (Doc. No. 84). The parties' pending motions are ripe for disposition.

---

[4] Although the Court granted this motion, Defendants never filed a reply brief.

## II. LEGAL STANDARDS

### A. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson, 477 U.S. at 257. When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings. When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring). The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "he must make a showing sufficient to establish the existence of every element essential to his case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co., 475 U.S. at 588 (citation omitted). In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor." See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." See L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties. See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed. Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'" See Anchorage Assoc. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

The above standards do "not change when the issue is presented in the context of cross-motions for summary judgment." See Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006) (unpublished) (citations omitted); see also Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (explaining that when cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard"). "If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party

deserving the judgment in light of the law and undisputed facts." Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

### B. Section 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id. "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

### C. Exhaustion of Administrative Remedies Under the Prison Litigation Reform Act ("PLRA")

The PLRA states in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite

for a prisoner asserting a claim under Section 1983 regarding their prison conditions. See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88). "These applicable procedural rules are supplied by the individual prisons." Id. (citations omitted); see also Spruill, 372 F.3d at 222 (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

Here, the applicable grievance policy is DC-ADM 804. See DC-ADM 804, available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievan

ces.pdf (last visited July 31, 2026).[5] Under DC-ADM 804, the DOC requires every inmate in its custody to "have access to a formal procedure" through which the inmates can "seek resolution of problems or other issues of concern arising during the course of [their] confinement." See DC-ADM 804, Policy Statement, § 3. The DOC refers to its "formal procedure" as the "Inmate Grievance System," see (id.), and it is comprised of three (3) separate steps. See (id., Inmate Grievance System Procedures Manual, §§ 1–2). The first step requires the inmate to submit a written grievance to the Facility Grievance Coordinator or designee, usually the Superintendent's Assistant, within fifteen working days after the event upon which the grievance is based. See (id., Inmate Grievance System Procedures Manual at § 1.A.8). For the second step, the inmate must appeal an initial review response/rejection to the Facility Manager or designee within fifteen working days from the date of the initial review response/rejection. See (id. at § 2.A.1.a). For the third step, if the inmate "is dissatisfied with the disposition of an appeal from the Facility Manager/designee," they must "submit an Inmate Appeal to Final Review" to SOIGA within fifteen working days of the date of the Facility Manager/designee's decision. See (id. at § 2.B.1.b).

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. See Spruill, 372 F.3d at 230–32 (concluding that the PLRA's exhaustion requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural

[5] The Court takes judicial notice of the DOC's three-tiered inmate grievance procedure as set forth in DC-ADM 804, as it is publicly available on the DOC's website. See Vanderklok v. United States, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (taking judicial notice of Department of Homeland Security's administrative program because it "is publicly available on government websites"); Blair v. Carl, No. 24-cv-00211, 2024 WL 3850444, at *8 n.6 (M.D. Pa. Aug. 15, 2024) (taking judicial notice of DC-ADM 804.2 (citing Spruill, 372 F.3d at 232)).

default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures"). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)). "Available means capable of use; at hand." Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)). "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." Small, 728 F.3d at 271.

The failure to exhaust available administrative remedies "is an affirmative defense under the PLRA." See Jones, 549 U.S. at 216. As such, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." See Rinaldi, 904 F.3d at 268 (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)). However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them]." See id. (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA, i.e., to "return[] control of the inmate grievance process to prison administrators, encourag[e] the development of an

administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted); Jones, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court"). It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone." See Rinaldi, 904 F.3d at 268 (citation and internal quotation marks omitted).

## III. DISCUSSION

Presently before the Court are the parties' cross-motions for summary judgment and James's response to the Court's Order to Show Cause. The Court will address each submission in turn.

### A. James's Response to the Court's Order to Show Cause

Because discovery in this action concluded on June 22, 2025, see (Doc. No. 77 at 5), without James having sought leave to amend his amended complaint to name the CO Does, the Court issued an Order on October 15, 2025, requiring him to show cause why the Court should not dismiss his claims against them for his failure to name them. See (id.). James appears to have responded (at least in part) to the Court's Order through filing his "Memorandum of Law in Support of [His] Motion to Show Cause/and Compel Complete Discovery Response [sic] Production of Documents." See (Doc. No. 78). In this submission, James addresses topics well beyond the scope of the Court's Order to Show Cause, and the way he discusses these topics is

disjointed and confusing.[6] His submission arguably consists of: (1) a motion to compel Defendants to produce complete responses to his first request for production of documents insofar as (a) Defendants have not produced or otherwise made available to him for inspection "the housing DVD security footage from July 17, 2019[,] through July 20, 2019" and (b) Defendants failed to sufficiently respond to his request that they "[p]roduce through reports[,] notes, [and] records the identities" of the CO Does, who he alleges "conducted the multiple strip searches of [him] and investigative search of [his] cell . . . on July 17, 2019 at SCI[]Coal [Twp.]," see (id. at 1; Doc. No. 78-2 at 2); (2) an argument that Defendants' production of "confiscations slip #107738" as responsive to his request for documents identifying the CO Does was insufficient, see (Doc. No. 78 at 2); (3) a contention that the Court committed an abuse of discretion and reversible decision when it dismissed several of his named Defendants earlier in this case, see (id.); and (4) a request for sanctions, which includes a spoilation inference insofar as Defendants claim that they do not have the video recordings he requested in discovery, see (id. at 6–7).

Insofar as any of James's submission consists of arguments about this Court's prior rulings, the Court will not address them here, as it is wholly improper for James to include such claims in his submission. If he disagreed with the Court's March 2024 Memorandum and Order, which was issued more than two years ago, he could have sought reconsideration, or in the

[6] Throughout his submissions the Court addresses in this Memorandum, James repeatedly uses lengthy, run-on sentences containing legalese or factual assertions without connecting them to a date, event, or specific Defendant (either remaining in the case or previously dismissed). While James has continued to show the ability to write clearly and identify his legal claims, and, as discussed infra, was eloquent when describing his remaining claims during his deposition, see (Doc. No. 75-7), the way in which he argued and pleaded some of his claims in his amended complaint has rendered it quite difficult for the Court to ascertain his precise arguments and claims while reviewing his pending submissions in this case.

alternative, if this case is ultimately resolved in a matter unsatisfactory to him, he can file an appeal with the Third Circuit Court of Appeals.

As for James's motion to compel discovery, the Court will deem it withdrawn because he failed to file a separate brief in support of the motion as required by the Court's Local Rules. Local Rule 7.5 contemplates and requires that a party file a motion and a separate brief. See M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion. . . . If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."). The only occasions in which a separate brief are not required are: (1) when a party moves for an extension of time "if the reasons for the request are fully stated in the motion"; (2) when a party files a motion "which has the concurrence of all parties, and the reasons for the motion and the relief sought are fully stated therein; and (3) when a party files a motion seeking the appointment of counsel. See M.D. Pa. L.R. 7.5. James's motion to compel is not one of these types of motions for which a supporting is excused. Although the Court recognizes that James is incarcerated and proceeding pro se, as well as that he included legal arguments in his motion, he and other pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala, 704 F.3d at 245).

Even if the Court did not deem James's motion to compel withdrawn, the Court would deny it for two reasons. First, James failed to timely file the motion. Regarding such motions, the Court notes that:

> Issues regarding the scope and timing of discovery rest in the sound discretion of the court. Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 90 (3d Cir. 1987). Where a party has submitted an untimely discovery request, the court can, and in the exercise of its discretion often should, refuse to compel compliance with that request. See, e.g., Maslanka v. Johnson & Johnson, 305 F. App'x 848 (3d Cir. 2008) [(unpublished)] (affirming denial of pro se litigant's motion to compel where

> discovery demands were untimely); Oriakhi v. United States, 165 F. App'x 991 (3d Cir. 2006) [(unpublished)] (same); Bull v. United States, 143 F. App'x 468 (3d Cir. 2005) [(unpublished)] (same).
>
> To that end, a motion to compel filed after the deadlines for discovery and the filing of dispositive motions is properly denied. Finzie v. Shineski, 351 F. App'x 668, 672, n.7 (3d Cir. 2009) [(unpublished)]; Frazier v. SCI Medical Dispensary Doctor + 2 Staff Members, No. 1:07-[cv-0]0194, 2009 WL 136724, at *2 (M.D. Pa. Jan. 16, 2009) ("A motion to compel after the close of discovery is not timely and will be denied absent special circumstances."); Muniz v. Price, 3:10-cv-[00]345, 2010 WL 4537037, *3 (M.D. Pa. Nov. 3, 2010) (denying motion to compel as untimely and because "many of the discovery requests that are the subject of [motion] seek material which does not exist.").

See El Filali v. Harrisburg AL Opers. LLC, No. 23-cv-00133, 2025 WL 3532141, at *2 (M.D. Pa. Dec. 9, 2025).

Here, discovery in this action ended on June 22, 2025, see (Doc. No. 77 at 5), and James seeks to compel responses to his document requests months after the deadline expired.[7] In addition, although James mentions that he filed a motion to compel discovery on February 10, 2025, see (Doc. No. 78 at 2); see also (Doc. No. 64), it does not help his argument because: (1) the motion itself did not pertain to the sufficiency of Defendants' response to his written discovery requests, rather, James alleged that Defendants did not respond at all to those requests, see (Doc. No. 64 at 1 ("[A]s of the date of the instant motion Plaintiff has not been served with response [sic] as the close of discovery is pending."); and (2) James never filed a motion or any other submission claiming that Defendants failed to sufficiently respond to his discovery requests

[7] The Court acknowledges that James filed his motion approximately a month after the Court issued an Order, which, inter alia, retroactively extended the discovery deadline to June 22, 2025. See (Doc. No. 77). Nevertheless, prior to that Order, the discovery deadline was set to expire on April 14, 2025, see (Doc. No. 66), and regardless of whether there were pending motions to extend the discovery deadline thereafter, that was the specific deadline unless and until the Court formally extended it, and James never filed a motion to compel relating to the allegedly missing discovery until the Court directed him to show cause why his claims against the CO Does should not be dismissed. In other words, he still had months to file a motion to compel and did not do so.

prior to the close of discovery and only filed it after the Court directed him to explain why the Court should not dismiss his claims against the CO Does for failing to name them during discovery. Overall, the fact that James filed this prior motion to compel does not negate the fact that his current motion to compel is untimely.

Second, even if the Court considered James's motion to compel on its merits, the Court would deny it because he has not demonstrated that Defendants' responses to his discovery requests were inaccurate or incomplete. Regarding the video footage from July 17, 2019, through July 20, 2019, Defendants informed James that the footage does not exist. See (Doc. No. 78-3 at 2, 3, 4). Whether the footage existed at one point, as James alleges, see (Doc. No. 78 at 2 (referencing McGinley's facility manager appeal response in which he stated, "[t]his writer can also verify that video supports that when the search was concluded[,] staff are only seen to be removing from your cell two empty boxes (one which was returned to you) and a torn/altered mattress"); see also (Doc. No. 78-3 at 9), the fact remains that Defendants informed James that it no longer existed at the time they answered his document requests, and he never took any action to move to compel the video footage until several months after discovery concluded.

Concerning James's response to the Order to Show Cause, he never squarely addresses this Order and instead responds as though his motion to compel satisfies the Court's Order. He is mistaken. By directing James to show cause why the Court should not dismiss his claims against the CO Does due to his failure to identify them during discovery, the Court did not expressly or implicitly invite James to seek additional discovery. Rather, the Court essentially sought his explanation as to why he failed to identify them. Since James has not directly answered this question, the Court construes his submission as containing three reasons: (1) he lacked access to the video footage so he could identify the CO Does; (2) Defendants insufficiently responded to

his discovery request seeking the CO Does' names when they only provided him with - "Confiscated Items Receipt #107738"; and (3) prison officials never identified the CO Does during the grievance process. See (Doc. No. 78 at 1–2). None of these reasons justify James's failure to name the CO Does to date.

Beginning with the video footage, the Court notes that the incident at issue occurred more than seven years ago. Although it appears that the CO Does who searched James's cell "were not regular members of that detail," see (Doc. No. 78-3 at 9), there is no indication that viewing the video footage would have provided James with the identities of the CO Does any more than it did when he was actually physically with them on July 17, 2019. In other words, James alleges that he was unable to identify the CO Does despite being in their presence for a significant period of time (which allegedly included two strip searches, conversations with the officers, etc.) on July 17, 2019. See (Doc. No. 34 at 10–14 (describing alleged interactions with CO Does)); see also (Doc. No. 1 ¶¶ 16, 23 (alleging that the CO Does appeared at his cell at 8:45 a.m. and left at around 11:30 a.m.)).[8] Yet, he believes that the prison video footage, which no longer exists, would somehow reveal the CO Does' names to him. It is pure speculation on James's part that he could obtain the CO Does' names from the video footage when he was unable to do so when in their physical presence for a substantial period on July 17, 2019.[9]

As for Defendants providing him with the confiscated items receipt as their response to his document request, although James indicates that "Defendants responded unreasonably [by]

[8] According to McGinley's Facility Manager Appeal Response, the search of James's cell began at 9:27 a.m. and ended at 11:03 a.m. See (Doc. No. 78-3 at 9).

[9] For instance, if the CO Does were wearing nametags on their uniforms, it seems quite likely that James was in a better position to identify them from his personal observations than from a video recording, the quality of which is unknown.

suggesting [he] could identify [the CO Does] through [the] confiscation slip," at no point in his submission does he explain why he could not identify the CO Does by reviewing the confiscation slip. He also never attaches a copy of the confiscation slip to his submission, so he does not support his argument with the relevant supporting exhibit.[10] Moreover, if James thought that the confiscation slip was insufficient, he should have moved to compel Defendants to provide additional documents if there were any in their possession or otherwise accessible to them. He failed to do so.[11]

Finally, to the extent that James complains about prison officials' responses to his grievances, he points to no part of the DOC's grievance policy that would have required any prison official to provide him with the names of the CO Does, and the Court is aware of no such provision in the DOC's written policies. Even if there was such a provision, it does not excuse James's failure to obtain the CO Does' names during discovery which started back on September 30, 2024. See (Doc. No. 55 at 2 (establishing initial discovery deadline)).

As previously explained to James, "[c]laims against John or Jane Doe defendants are properly dismissed when the defendants have not been identified prior to the discovery deadline." See (Doc. No. 77 at 3 (quoting Martinez v. Berfield, No. 20-cv-01759, 2024 WL 4311474, at *2 (M.D. Pa. Sept. 26, 2024))). "While courts often allow plaintiffs to name

---

[10] Defendants attach to their motion for summary judgment what appears to be the confiscation slip referenced by James in his motion. See (Doc. No. 75-1 at 2). The confiscation slip does not list four names; rather, it identifies one person, CO Maust, as the staff member who confiscated and disposed of James's items from his cell. See (id.). It is unclear why James did not seek to amend his operative complaint to at least add CO Maust as a Defendant in this case, and he did not attempt to do so in his response to the Court's Order to Show Cause. It is equally unclear why James would not have attached a copy of this document to his motion.

[11] Although the Court will not speculate as to why James did not simply ask Defendants to identify the CO Does through a written interrogatory, the fact remains that it would have been the most prudent way to obtain the CO Does' names from Defendants.

'Doe defendants . . . as stand-ins for real parties until discovery permits the intended defendants to be installed[,]' '[t]he case law is clear that [f]ictitious parties must eventually be dismissed, if discovery yields no identities.'" Rodgers v. Abington Twp., No. 25-cv-04339, 2026 WL 2160445, at *14 (E.D. Pa. July 27, 2026) (quoting Hindes v. F.D.I.C., 137 F.3d 148, 155 (3d Cir. 1998) and citing Blakeslee v. Clinton County, 336 F. App'x 248, 250 (3d Cir. 2009) (unpublished)); see also Blakeslee, 336 F. App'x at 250 ("If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed.").

Here, the Court concludes that James has failed to set forth good cause or any justifiable reason for his failure to identify the CO Does in this case that has been pending since June 17, 2021, and, at least as to the CO Does, is based on conduct that allegedly occurred on July 17, 2019. Accordingly, the Court will dismiss James's remaining claims against the CO Does. See, e.g., Evans v. Kaye, No. 19-cv-01112, 2021 WL 5416282, at *5 (M.D. Pa. Nov. 19, 2021) (dismissing Doe defendant at summary judgment stage due to plaintiff's failure to identify the defendant during discovery).

**B. James's Cross-Motion for Summary Judgment**

James submitted a document titled, "Plaintiffs [sic] Motion for Summary Judgment, Memorandum Supplement Motion Memorandum of Law in Opposition SOF Defendants TRO Entitlement Special Relief Declaratory Judgment," which the Court construes, at least in part, as a motion for summary judgment. This submission also contains other arguments, motions, and requests that have nothing to do with James's remaining causes of action in this case. The Court will first address James's submission to the extent that he intended it to serve as a motion for summary judgment before turning to his other arguments, motions, and requests he appears to assert therein.

To the extent that James intended his submission to serve as a motion for summary judgment, the Court will deem it withdrawn due to James's failure to file a supporting memorandum of law in accordance with the Local Rules. See M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion. . . . If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn.").[12] Even if the Court did not deem the motion withdrawn, the Court would deny it for noncompliance with the Local Rules because James never submitted "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which [he] contends there is no genuine issue to be tried." See M.D. Pa. L.R. 56.1.

---

[12] The Court recognizes that more than two months after filing his motion for summary judgment, James filed a "Memorandum of Law in Support of Motion for Judgement [sic] on the Pleadings." See (Doc. No. 84). There are several issues with this submission. First, James never filed a motion for judgment on the pleadings. Second, even if the Court, due to James's pro se status, liberally construed it as a memorandum of law in support of his motion for summary judgment, the Court would not consider it because it is untimely, see M.D. Pa. L.R. 7.5 (requiring movant to submit supporting brief within fourteen days after filing corresponding motion), and James never sought and received an extension of time to file a late supporting memorandum of law. Third, James's memorandum of law does not address any of his causes of action in this case. Fourth, James appears to argue in his memorandum that he is entitled to judgment on the pleadings because Defendants never filed a reply brief in further support of their motion despite receiving an extension of time to do so, see (Doc. No. 84 ¶¶ 6–7), which is not a basis upon which to grant him judgment on the pleadings. Fifth, and finally, James indicates in his purported memorandum of law that he seeks to have the Court grant "all relief" he sought "in his opposition response to the Defendants' Motion for Summary Judgement [sic]" due to Defendants "waiv[ing] their ability to further response [sic] as any such filing should be stricken from the record and [he] has demonstrated his entitlement to relief," which is wholly improper insofar as the only relief James could request via his brief in opposition to Defendants' motion for summary judgment is for the Court to deny Defendants' motion, and he is not entitled to a ruling in his favor on Defendants' motion solely because they never filed a reply brief in further support of their motion.

As for the remainder of James's submission, it appears that he, inter alia, seeks the appointment of counsel so he can argue:

> why [non-Defendant and current DOC Secretary Laurel] Harry . . . should not [sic] be rightfully and lawfully supplemented regarding [his] policy, custom[, and] practice claims emergency [sic] injunctive relief, why [e]xecutive and corrections [d]efendants be enjoined conspiracy [sic], chain conspiracy denial [sic] of ADA protection despite [his] class of one certification, interlocutory appeal, [and] whether [he] has adequately plead [sic] material facts warranting enjoining of multiple cases which related to same [sic] defendants. The complex questions of law, the obstructive and continued retaliatory conditions even during the pendency of all these cases 1:25-cv-00059 James v. Harry on appeal No. 25-2393[,] there are claims against Defendants Executive [sic] pending before the Third Circuit Court of Appeals 25-1035 James v. Wetzel, et al. [sic][,] and the continued government obstruction of [his] ability to prosecute default [sic] judgement [sic] against Defendant Perillo 14-69 Erie James v. Sauers, et al. [sic].

See (Doc. No. 80 at 1–2). James claims that this Court "has original jurisdiction to resolve [his] class of one certification, preliminary and declaratory and/or special relief authorized by 42 U.S.C. § 1983, § 1985[,] and § 1986[,] declaratory relief pursuant to 28 U.S.C. § 2201, § 2202[,] and injunctive relief authorized by 28 U.S.C. § 2283, § 2284, [Federal Rule of Civil Procedure] 65." See (id. at 2).

Although James uses approximately four additional pages to describe his additional claims and arguments that he believes the Court should consider at this stage, the Court will deem his submission, to the extent it can be construed as any motion other than one seeking appointment of counsel, withdrawn, because he failed to file a separate brief in support of it as required by the Local Rules. See M.D. Pa. L.R. 7.5. In addition, as with his purported motion for summary judgment, even if the Court did not deem any other motions (other than one seeking counsel) withdrawn, the Court would deny any purported motion because nothing James discusses therein relates to his pending claims in this case against the remaining Defendants. In other words, James appears to be attempting to amend his amended complaint or seeking some

form of emergency injunctive relief. If James sought to amend his amended complaint, he needed to file a motion for leave to file a second amended complaint, attach a proposed second amended complaint to his motion, and file a supporting brief. See, e.g., Sgagias v. Newberry Twp. Police Dep't, No. 24-cv-01632, 2025 WL 1427810, at *2 n.3 (M.D. Pa. Feb. 3, 2025) ("If Sgagias seeks leave to amend, he must file a motion to amend along with a brief in support. Further, he must comply with Local Rule 15.1, which requires, among other things, that a copy of the proposed amended complaint be filed with the motion." (citing M.D. Pa. L.R. 15.1)). Similarly, if James sought some form of emergency injunctive relief, he needed to file an appropriate motion and a supporting brief, and his requests for any injunctive relief should relate to his pending claims in this case. See Adams v. Freedom Forge Corp., 204 F.3d 475, 489–90 (3d Cir. 2000) (concluding that a preliminary injunction was inappropriate where the harm alleged in the request for preliminary injunctive relief was "insufficiently related to the complaint and [did] not deserve the benefits of protective measures that a preliminary injunction affords" (citations omitted)); Moneyham v. Ebbert, 723 F. App'x 89, 92 (3d Cir. 2018) (unpublished) ("The District Court was correct to deny this requested injunction because it involved allegations unrelated to the complaint"); Pinson v. United States, No. 17-cv-00584, 2017 WL 5158628, at *6 (M.D. Pa. Nov. 7, 2017) ("While '[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally,' an injunction should not issue when 'it deals with a matter lying wholly outside the issues in the suit.'" (quoting De Beers Consol. Mines v. United States, 325 U.S. 212, 220 (1945))); see also Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint . . . .").

James has not taken any of those actions here; instead, he complains (again, in a document that he identifies in part as a motion for summary judgment) about, inter alia: (1) being placed in the RHU in a different state correctional facility more than two years after he filed his complaint in this case, see (Doc. No. 80 at 2 (indicating he was placed in the "SCI-SMR" RHU on "8-4-23"); id. at 4 (alleging that his mental health conditions were worsened by his placement in the RHU)); (2) unidentified individuals associated with the DOC deprived him of access to the court resulting in him filing a "defective pleading," see (id. at 4); and (3) his receipt of "grossly inadequate" "[two-hour] sessions with [his] history of learning disabilities," which constitutes deliberate indifference to his serious medical needs, see (id.). None of these claims are related to the pending claims in this case. Therefore, even if the Court did not deem any additional motions contained in James's summary judgment submission withdrawn, the Court would deny those motions because his requests either have no relation to this case or he did not file proper motions to seek the relief he requests.

As for James's motion to appoint counsel, the Court will deny this motion. It is apparent upon reading James's motion that he seeks counsel to prosecute the aforementioned additional claims that are wholly unrelated to the remaining factual allegations and causes of action in this case. He does not state at any point that he seeks counsel to litigate any aspect of this case as presently constituted. Accordingly, the Court will also deny James's frivolous motion to appoint counsel without addressing the factors set forth in Tabron v. Grace, 6 F.3d 147 (3d Cir. 1993).[13]

[13] Even if James had requested that the Court appoint counsel to represent him in prosecuting his remaining claims in this case, the Court would deny it without prejudice for reasons previously stated when denying without prejudice his prior motions to appoint counsel. See (Doc. Nos. 22 at 2–5; 54 at 41–43).

### C. Defendants' Motion for Summary Judgment

Defendants contend that they are entitled to summary judgment on James's remaining claims against them in his amended complaint. They argue that (1) James failed to exhaust his administrative remedies regarding his deliberate indifference claim against DiNapoli and Green, (2) the statute of limitations bars James's retaliation claim against Belles, (3) James failed to establish a prima facie retaliation claim against Belles, (4) James failed to produce any evidence showing that DiNapoli and Green were deliberately indifferent, and (5) the Court should dismiss James's claims under the Pennsylvania Constitution because summary judgment is proper as to all his federal claims. See (Doc. No. 76 at 13–40). The Court will address Defendants' arguments by first discussing James's Eighth Amendment claims against DiNapoli and Green, then turning to his First Amendment retaliation claim against Belles, and finally discussing his claims for violations of the Pennsylvania Constitution.

#### 1. James's Eighth Amendment Claims Against DiNapoli and Green

##### a. James's Allegations

James alleges that prison officials conducted a search of his cell on July 17, 2019. See (Doc. No. 34 ¶ 43). Before the cell search, John Doe #1 "unnecessarily applied excessively tight . . . handcuffs despite [James] at no time . . . acting aggressively, or violating any policy or procedures." See (Doc. No. 34 ¶ 48). James was "cuffed behind his back." See (id. ¶ 52).

Following the second of the two strip searches allegedly performed on James on July 17, 2019, "Defendants" locked him "inside the inmates [sic] bathroom on [his] housing unit." See (id. ¶¶ 49, 57). James appears to allege that "Defendants" did not use an existing "cuff port" by which they could remove his handcuffs and "re-cuff [him] without risk to any staff or inmate health or safety." See (id. ¶ 57). He further alleges that "Defendants re-cuff[ed him] excessively

tight with extreme force to inflict and did inflict severe pain[, and he] requested and [D]efendants denied [his] request to stop that pain being inflicted by the tight cuffs." See (id. ¶ 59).

While his cell was searched, James alleges that DiNapoli and Green "caused [him] to be subjected to excessively tight applied restraints, locked in an extremely hot bathroom without [a] proper ventilation system, [denied him the] ability to use the bathroom . . ., and denied [his] request for medical care." See (Doc. No. 34 ¶ 79). He also alleges that he was:

> lock[ed] . . . in the inmate bathroom which had no vents, air, smelled of urie [sic] and was just extremely hot for the summer heat. After a half hour[, he] requested that [DiNapoli and Green] advise the security officers of [his] need for his inhaler and need to use the bathroom which [DiNapoli and Green] ignored despite their observance and [his] request for medical care[,] aid[,] and basic humane [sic] need to use the bathroom[. He] remained locked in the bathroom . . . for nearly [two hours,] from around 8:50 [a.m.] through 11:30 [a.m.]

See (id. at 60).

**b. Factual Record**[14]

James's cell at SCI Coal Twp. was searched on July 17, 2019. See (Doc. No. 75 ¶ 26; Doc. No. 75-1 at 2). James testified during his deposition that neither DiNapoli nor Green participated in his strip searches, the search of his cell, or placing him in handcuffs. See (Doc. No. 75-7 at 66–67, 69).[15] They were also uninvolved with locking James in the bathroom; rather, "they just were observants of [him] being locked in the bathroom." See (id. at 67–68).

---

[14] Although James filed a response in opposition to Defendants' motion for summary judgment (Doc. No. 79), he did not specifically respond to Defendants' statement of undisputed facts ("SOF") as required by Local Rule 56.1. As such, the Court considers the facts in Defendants' SOF to be undisputed for purposes of resolving all arguments in their motion. See M.D. Pa. L.R. 56.1 (requiring the non-moving party to file a "separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth" in movant's statement of material facts). Nevertheless, the Court will also consider the entirety of the record in determining whether summary judgment is appropriate in this case.

[15] James indicated that Green "was the housing sergeant for the unit that day," and DiNapoli "was the officer present on the unit that day for the day." See (id. at 66).

James estimates that he remained in the inmate's bathroom for "about two hours." See (id. at 69–70). After he was in the bathroom for approximately forty-five minutes, James asked DiNapoli and Green, who were not posted at the door of the bathroom but at times performed rounds while he was in the bathroom, to allow him to use the bathroom, which he could not do without their assistance because of the handcuffs. See (id. at 68, 70, 71, 75, 95–96). At or around the same time, James felt congested and advised DiNapoli and Green that he needed to use his inhaler because he had asthma and was "having some difficulty breathing." See (id. at 70–71, 72–73). He asked DiNapoli and Green to either retrieve the inhaler themselves or inform the security officers conducting the cell search that he needed it. See (id. at 72–73). James then saw DiNapoli and Green go to James's cell and speak to other staff members there, but he did not know what they said. See (id.). James believes that DiNapoli and Green "took no steps to facilitate" getting his inhaler as "no one ever came back" with it, and he "continue[d] to remain in the bathroom, unable to use the bathroom and struggling to breathe." See (id. at 73, 74).

While in the bathroom, James told DiNapoli and Green that his handcuffs "were very tight." See (id. at 75). However, DiNapoli and Green did not loosen his handcuffs. See (id.). James also requested that DiNapoli and Green "file or assist [him] in filing an inmate abuse complaint" but they did not assist him with filing a complaint. See (id. at 81). James eventually used the bathroom as well as his inhaler once he returned to his cell after the other officers completed the cell search. See (id. at 76).[16]

[16] James testified that after returning to his cell, finding and using his inhaler, and observing that his cell "had been absolutely destroyed," he asked DiNapoli and Green to document the condition of his cell. See (id. at 79–80). "They opted against doing it." See (id. at 80).

On July 18, 2019, James filed a grievance (No. 814321) relating to, inter alia, what transpired between him, DiNapoli, and Green on July 17, 2019, while officers searched his cell, . See (id. at 77–78). In this grievance, James described what occurred as follows:

> On July 17, 2019[,] at around or about between the hours of 8:45 [a.m.] and 11 [a.m.] the time periods for which pursuant to DC-ADM 001 and DC-ADM 804 procedural manuals as relief requested seek [sic] preservation of all DA-Housing Unit security video Pod Footage from [July 17, 2019] and the times identified. As this Grievance [sic] shall/should sever [sic] as **"NOTICE"** that this inmate pursuant to 42 U.S.C. § 1983 and his United States and Pennsylvania [c]onstitutional [r]ights [sic] [f]ree [s]peech [r]ights, [a]ccess to the [c]ourts [r]ights and [d]ue [p]rocess [r]ights alerts SCI-Coal T[wp.] Administrators that I intended [sic] to file a [p]ro[]se 42 U.S.C. § 1983 [c]ivil [r]ights [a]ction against the security officers who intentionally at [sic] the behest of Lt. Belles[,] Security Lt.[,] who instructed the investigative search and ultimate unlawful confiscation & destruction of my cell and its contents which includes but is not limited to my legal material and impediment of my ability to pro se represent [sic] litigate my active non-frivolous cases. As stated above[,] between the aforestated [sic] hours of 8:45 [a.m.] and 11 [a.m.] C/O officers approached my cell and ordered me to be cuffed and then placed me in strip cage where I was stripped and re-handcuffed at which time [I] was removed from the strip cage and placed [in] the inmate bathroom on DA-Housing Unit locked in there with handcuffs for nearly 2 ½ hours while the search of my cell was conducted. Prior to exiting my cell after notice of the nature of search [sic][,] I immediately altered [sic] officer that I am pro[]see in several active cases pending criminally before the Pennsylvania Superior Court, preparing a [f]ederal [h]abeas [c]orpus petition, and two separate 42 U.S.C. § 1983 [c]ivil [c]omplaints and preparation of a third additional action against SCI-Coal T[wp.] administrators[. T]his information was to bigger [sic] of the two security officers as one of the officers was a rookie officer. This officer and the other officers present stated that they didn't "give a fuck" and were going to destroy my cell and I better shut up if I knew what was good for me, and that if file [sic] any more grievances or law suits [sic], they would fuck this grievant up and bury me in the hole! I requested that the search be conducted on video being that I was unable to be present and because of [indiscernible] awareness of [c]ivil actions against SCI-Coal T[wp.] Administrators including the preparation of another action against the security office namely Lt.'s [sic] Belles and Dricus [sic]. After destroying my cell [I] was released back to my cell where I found it absolutely destroyed[.] Officers had not only taken all my separate legal filings and threw it all together, documents related to [c]ivil [a]ction James v. Varano [sic] and new action were visually missing which had the names of officers. I requested to see a Capt. Lt. Major [sic] which was denied[,] and I was threaten [sic] with placement in the restricted housing and physical harm & retaliation for any complaints. During the search no contraband was found in particular no weapon and no misconducts issued. I repeatedly requested documentation of my cell as it was impossible for me to clean my cell

> because officers confiscated all of my legal boxes which had individually itemized separately my legal filings. On July 18, 2019[,] at around or about between 6:33 [a.m.] and 7:30 [a.m.] periods which I seek preservation of all DA-Housing Unit Pod Footage Video, will show on my way to breakfast I found Lt. Dricus [sic] and other security officers searching DB-Housing Unit[.] [R]eview of this footage will demonstrate this inmate and Lt. Druic [sic] returing [sic] to my cell and me showing Lt. Driucs [sic] the destruction of my cell and property, which includes but is not limited to my request of [sic] upon him to order video documentation of my cell! Initiation of a DC-ADM 001 complaint as officers had threaten [sic] assault and placement in R.H.U. [sic] and requested that [I] have my legal boxes returned which he acted deliberately indifferent to see [sic] request.
>
> Relief [r]equested, that all pod video footage form 7-17-19 between 8:45 [a.m.] and 11[:]20 [a.m.] and all video footage from DA-Housing Unit from 7-18-19 is preserved from between 6:30 [a.m.] to 7:30 [a.m.] is preserved[. F]ailure to do so amounts to "spoilation [sic] of evidence"., [sic] 2. I want the names of all the security officers who entered my cell on 7-17-19, I want the officers who unlawfully confiscated my legal [sic], destroyed my trial prep for Civil Action No. 14-69 Erie and appeal response for [C]ivil [A]ction [N]o. 1:14-[cv]-1951 James v. Varano and my [f]ederal [c]ivil [r]ights [h]abeas [c]orpus that these officers be held liable financially in the amount of $200,000 compensatory damages and $200,000 punitive damage for violation of this grievants [sic] due process rights, access to the courts, retaliation [sic]. That the identity of all security officers who were present be made known as they can be named as defendants in a civil rights action, that my cell is documented on video[,] any other equitable relief which this inmate is entitled to for violation of his protected conduct. That these officers are suspended without pay for [seven] days[,] that they are retrained in terms of conducting cell searches, and that all future cell searches related to this grievant are conducted on camera and that video preserved, which includes[,] but is not limited to[,] a policy change of anytime an inmate is not present said searches be documented on video and preserved.

See (Doc. No. 75-3 at 3–4).[17]

[17] Pursuant to DC-ADM 804, James had until August 7, 2019, to file a grievance relating to the cell search or any other activity that occurred that day, unless he received an extension of time to file a grievance. See (Doc. No. 75 ¶ 27); DC-ADM 804 § 1.A.8 ("The inmate must submit a grievance to the Facility Grievance Coordinator/designee, usually the Superintendent's Assistant, within 15 working days after the event upon which the claim is based."); DC-ADM 804 § 1.C.2 ("A time extension for filing a grievance will be considered on a case-by-case basis."). The only grievance James filed between July 17, 2019, and August 7, 2019, was Grievance No. 814321. See (Doc. No. 75 ¶ 28 (citing Doc. No. 75-2 at 2–3)).

James also described the "actions taken and staff [he had] contacted, before submitting the grievance" as follows:

> Requested prior to and after to see Capt. Lt. Major [sic] and was refused said request, spoke to and showed Lt. Dricus [sic] destruction of cell [and] legal material and advised him of unlawful confiscation of my court documents and requested documentation of the state of cell[,] which was denied due to deliberate indifference retaliatory [sic], conspiracy cover up.

See (id. at 3).

Through an Initial Review Response dated August 14, 2019, which James received on August 16, 2019, non-Defendant Captain Burns ("Burns") denied James's grievance. See (id. at 5, 6). Burns set forth his reasons for denying the grievance as follows:

> An investigative cell search was authorized and was completed on your cell[]by the Security Office. During the investigative search[,] you had confiscated from you [one] altered and damaged master lock, [three] cigarette lighters, [one] cigarette roller[,] and [four] excess storage boxes. A DC-154A was issued to you for those items.
>
> Staff involved in the search were interviewed and deny destroying any items or taking any items not listed on the DC-154A that you received a copy of. You have been searched before and realize that during a search items will be moved and may not be placed back in the identical location they were retrieved from to be searched, however the items are not destroyed when the [sic] are placed on the bed, floor or table after being searched.
>
> Your property was not destroyed and you were advised in writing of the items confiscated, therefore this grievance is denied. Your request for monetary relief as well as the suspensions of the officers conducting the search is denied. Your request for a policy change is moot since it already covers when an inmate can / must be present for a search and when the search can be completed without your presence. You are not and will not treated any differently than any other inmate in general population.

See (id. at 5).

James apparently was dissatisfied with the Initial Review Response and, as such, submitted an Appeal to Facility Manager dated August 25, 2019. See (id. at 6). In this appeal, James described his issues as follows:

> I am submitting this appeal in opposition to the initial review response issued by . . . Burns, where therein his response he acknowledges that in fact an investigative cell search was conducted but fails to acknowledge that security officers failed to comply with all [DOC p]olicies, [p]ractice[,] and [p]rocedures i.e. [sic] this grievant without a sound or legitimate security rationale or government interest locked me in the inmates [sic] bathroom which was dirty, urine infested for more than two hours, despite established policy procedures of inmates being detained in strip cage under video recording evidence will show that said search was conducted in violation of DC-ADM 203 § D., not only wasn't there a security or other legitimate basis for this grievants [sic] absence during the search but officers subjected this grievant to inhumane cruel conditions of confinement by locking this grievant in the inmates [sic] bathroom for over two hours while this grievant remained handcuffed behind his back, despite there was no other staff or inmate present. Evidence will show staffs [sic] noncompliance with policy, its [sic] the contention of . . . Burns that despite security officers who violated one policy apparently he'd like to lead us to believe that officers complied with other policy directives i.e. [sic] related to DC-154A issuance of itemized confiscation slip. While a DC-154A was in fact issued it failed to list the legal materials officers confiscated and destroyed as retaliation for the law suit [sic] which this grievant was/had and was about to file against Lt. Belles and Lt. Dricus [sic] and other security officers, certainly security officers [sic] self-serving denials fail to amount to credible evidence against the facts presented by this grievant that the supposed investigative search was a ploy to retaliate against this grievant and a means to confiscate and destroy my property and legal material and obstruct deny [sic] my ability to bring my claims into court.
>
> Stated more clearly as this grievant plead [sic] immediately upon security officers arrival[,] I identified and advised that I could provide documentation for active cases, hence the supposed excess storage boxes which this grievant was denied the ability to provide documentation for the active cases, and while its [sic] self-explanatory that items will be moved around or even around during a searc [sic][,] here this grievants [sic] contention is that in retaliation for this grievants [sic] protected conduct and speech of filing grievances and law suits [sic] security officers intentionally after being placed on notice of this grievants [sic] impending deadlines/cases and that this grievants [sic] legal material; was separated. [sic] itemized and listed security officers destroyed this grievants [sic] filing system, confiscated and destroyed legal filings which were prepared and being prepared against not just security department but other SCI-Coal Township Corrections Officials as well as destroyed this grievants [sic] [h]abeas [c]orpus [p]etition which is a far greater issue then [sic] those materials just being simply moved[. S]ecurity personal [sic] intentionally not only destroyed my materials but threw together all

> my civil filings with my criminal [sic] despite finding these filings separately stored and itemized thus interfering with this grievance [sic] ability to litigate his causes of action in both [s]tate and [f]ederal [c]ourt.
>
> This grievant requested both prior and at the conclusion of the search that video recordings be generated as this grievant ultimately was able to demonstrate show [sic] to [sic] the aftermath to Lt. Dricus [sic] and Deputy Niclow [sic] who came to my cell[,] observed the destruction and acted deliberately indifferent to that notice and knowledge therefore the (RELIEF SOUGHT) [sic]: remand with instruction to provide the names of the security officers, acknowledement [sic] that all requested video is being preserved and SCI-Coal Township Facility Management understand that they have been placed on notice that I intend to file suit for this incident and that failure to preserve video is spoliation of evidence, that an interview of this grievant is conducted to conduct a reasonable investigation beyond just asking the violating officers if they in fact violated all pod video footage from 7-17-19 between 8:45 and 11;30 [sic] and that all video footage from DA-Housing Unit from 7-18-19 is preserved,, [sic] the names of all security officers who entered my cell 7-17-19, I want the officers who unlawfully confiscated my legal [sic], destroyed trial prep for civil action 14-69 Erie and appeal for [C]ivil [A]ction [No.] 1:14-[cv]-1951 James v. Varano and [f]ederal [h]abeas [c]orpus, that these officers be held liable financially in the amount of $200,000 compensatory damages and $200,000 punitive damages for violation of this grievants [sic] due process rights, access to the courts, retaliation [sic]. That these officers are suspended [seven] days, retrained in conducting cell searches pursuant to DC-ADM 203[,] that all video is preserved and a policy change that if an inmate is not present said searches be documented on video and preserved[,] and other equitable relief this grievant might lawfully be entitled [sic] for violation of his constitutional rights.

See (id. at 6–7).

Via a Facility Manager's Appeal Response dated August 28, 2019, McGinley denied James's appeal. See (id. at 8–9). In his Response, McGinley explained his reasons for denying James's appeal as follows:

> I have reviewed your appeal and initial review response by . . . Burns, while reviewing relevant records and speaking to appropriate staff. I write at this time to advise you that I concur with . . . Burns and his initial review response, while expanding on it.
>
> In addition to staff statements and following the review and acknowledgment of the items seized by the Security Captain, this writer has personally reviewed the video footage from the date of the cell search. First and foremost, the time you referenced that the search began and the length of the time you were 'confined to the bathroom' is not accurate. The search of your cell began at [9:27 a.m.] and ended at [11:03

> a.m.] At [11:15 a.m.], you were then viewed walking to your cell with a [confiscated items receipt ("CIR")] in hand, which noted all items confiscated. While I concur that items during a search will need to be moved or repositioned, I have no means to definitively state that such movement would have incurred the damage you referenced, nor could I definitively state that those same items weren't compromised prior to the search being conducted. This writer can also verify that video supports that when the search was concluded, staff are only seen to be removing from your cell two empty boxes (one of which was returned to you) and a torn/altered mattress.
>
> In addition, your inference that policy dictates that inmates are to be confined to the secure module in the Sergeant's office is also not accurate. It is this writer's preference that the secure module be utilized first, but not policy directed. I can only relay that the Officer's [sic] assigned to the search of your cell were not regular members of that detail and were simply unaware of my preference. Furthermore, and as with any cell search involving a cell which houses two inmates, one inmate is always secured in the unit bathroom. Your assertion that security provided no legitimate reason to not having you present during the search is not supported by policy, as the DC 6.3.1 (Section 30) reinforces the fact that your presence is not required during such.
>
> Based upon what is referenced above, the Facility Manager upholds the initial review response. As a result, all requested relief is denied.

See (id. at 8). McGinley also checked a box on the form indicating that James's appeal was frivolous, explaining that his "claims [we]re not supported by any violation of policy/procedure." See (id.).

Following McGinley's denial of James's appeal, James submitted an Appeal to Final Review (dated August 30, 2019) to SOIGA. See (id. at 10–11). In his appeal to SOIGA, James claimed as follows:

> I am submitting this appeal in opposition to the Facility Managers [sic] uphold [sic] decision of initial [sic] review response. The Facility Manager to support his denial firstly attempts [sic] dispute this grievants [sic] timeline contending that the search didn't begin until 9:27 [a.m.] until 11:03 [a.m.,] this is of no consequence as this grievant requested preservation of DA-Housing Pod Footage from the periods between 8:45 [a.m.] and 11[:]30 [a.m.] on the date of the incident, moreover what is factually indisputable is the officers present that day where [sic] in fact routine security officers, albeit upon information and belief one officer being a rookie corrections officer, however he was supervised by veteran security officers aware of the strip cage procedures, as well as cell search procedures which they

intentionally disregarded ignored [sic] and acted indifferent to. Before the search began[,] this grievant advised all present C/O of the fact that this grievants [sic] has/had numerous pending court deadlines, as well as impending filings for [h]abeas [c]orpus [r]elief on my criminal cases and that all said materials where [sic] separated and itemized which this grievant altered [sic] C/O to as well as advised officers that this inmate could provide documentation for active cases **James v. Sauers** 14-69 Erie and **James v. Varano** a pending criminal appeal before the Pennsylvania Superior Court No. 1477 WDA 2018, in addition that this inmate was filing an additional 42 U.S.C. § 1983 [c]ivil [r]ights complaint against Corrections Administrators here at SCI-Coal Township which included but was not limited to security officer's [sic] Lt. Dricus [sic] and Lt. Belles which officer responded with threats that if I did not cease such protected conduct that this grievant would suffer not only physically, but that I'd be placed in the Restricted Housing and that my property would be destroyed and confiscated which ultimately these officers did.

Video evidence will demonstrate officers removing this inmate from his cell without incident [sic] protest [sic] or issue and take the grievant to the strip cage area, where this grievant continued to be threaten [sic], its [sic] upon information and belief the grievant was taken to the strip cage area based upon security officers [sic] knowledge, notice and understanding of either the general/standard Coal Township practice policy [sic] and procedure related to the strip cage procedures or C/O awareness of a standardized practice policy [sic] and procedure relied upon, or enforced by the [DOC]. Whatever the case[,] the Facility Manager contends supposedly there is absence of any directive which spells out these practice [sic] and the [F]acility [M]anager goes not to state that the 'CIR" [sic] issued was all inclusive of any materials confiscated or destroyed during the search which is factually untrue. Contrary to the Facility Managers [sic] contention that only [two] empty boxes were confiscated which is factually untrue as this grievants [sic] court filings were outright removed/missing from his cell in retaliation for his protected conduct speech of filing non-frivolous [c]ivil [r]ights [a]ctions and [g]rievances. The Facility Managers [sic] position that it's simply his preference rather than policy practice [sic] or a legitimate based security interest which guides strip cage procedures and the locking of inmates in the bathroom cuffed for hours warrants remand and relief granted. This grievant had no cell mate [sic] and thus his subjection to inhumane conditions of confinement in violation of this grievants [sic] first [sic], fifth [sic], eighth [sic], and fourteenth [sic] United States Constitutional [sic] Rights [sic] are without bases [sic]. [**RELIEF SOUGHT**:] Remand with instructions to provide all relief including the identity of the Security Officers from that day who entered and searched my cell, that all video pod footage from DA-Housing Unit between 8:45 [a.m.] and 11:30 [a.m.] is preserved as I intend civil [sic] suit and failure to persevere [sic] amounts to **spoliation of evidence**[,] all pod footage from 7-18-19 is preserved that the security officers be held liable financially in the amount of $200,000 compensatory damages and $200,000 punitive damages for violation of this grievants [sic] due process and free speech rights, denial of access to the courts[,] and subjection to retaliation. That the C/O are suspended

> without pay for [seven] days and retained [sic] in conducting cell searches, pursuant to DC-ADM 203, policy change that if an inmate is not present said searches be documented on video and preserved, any other equitable relief this grievant might be unlawfully entitled for [sic] violation of his constitutional rights.

See (id.).

Through a Final Appeal Decision dated September 25, 2019 from Varner, the DOC's Chief Grievance Officer, James's appeal to SOIGA was denied. See (id. at 2). The reasons for the denial were as follows:

> You claim in your grievance that on 7/17/19 officers ordered you to be handcuffed and you were placed in a strip cage where you were stripped [sic] searched. You claim that you were left in handcuffs for nearly 2 ½ hours while your cell was searched. You claim that you informed the officers of your legal work and you claim you were threatened. You claim that those officers threw all your property together and some of it was missing. An investigation was conducted regarding your allegations. The record reflects that staff who searched your cell were interviewed. They reported that they did not destroy or take any items not listed on the CIR. The record reflects that when searching[,] some of the items do get mixed up; however, they are not destroyed. The record reflects that the search was conducted in accordance with DC ADM 203. You have failed to provide any evidence to substantiate your claims. There are no policy violations noted. Therefore, your grievance is denied as well as your requested relief.

See (id.).

#### c. Analysis

##### (1) Exhaustion

Defendants argue that James failed to exhaust his Eighth Amendment deliberate-indifference-to-serious-medical-needs and conditions-of-confinement claims against DiNapoli and Green. See (Doc. No. 76 at 13–17). The Court agrees.

Before addressing Defendants' arguments, the Court notes that James, despite appearing to recognize that Defendants raise an exhaustion argument in their motion for summary judgment, see (Doc. No. 79 ¶ 23 ("Defendants contend that Defendants weren't specifically named in Plaintiffs grievance 7-18-19[,] thus its [sic] their position they should be granted

summary judgment relief[.] Defendants have failed to shoulder their burden and summary judgement [sic] should be denied."), never substantively addresses Defendants' exhaustion argument in his response to their motion for summary judgment. See (id. at 1–9; Doc. No. 79-1 at 1–14). Instead, James devotes his submissions to, inter alia: (1) complaining about Defendants' responses to his written discovery requests, particularly as to their failure to provide him with the video footage he requested or other information pertaining to the identities of the CO Does, see (Doc. No. 79 ¶¶ 6–10, 12–14); (2) arguing that the Court committed an abuse of discretion in "erroneously grant[ing]" in part Defendants' partial motion to dismiss as well as dismissing his claim against Bauer pursuant to 28 U.S.C. § 1915(e)(2)(B), see (Doc. Nos. 79 ¶¶ 11, 17–21; 79-1 ¶¶ 5, 14, 21);[18] (3) repeating allegations and claims from his amended complaint

[18] James contends that the Court "failed to construe [his] amended complaint in the light most favorable to [him]" because if it did so, it would have found that "a reasonable jury could return a verdict in his favor regarding [Bauer's] denial of access to [the] court and government interference." See (Doc. No. 79 ¶ 20). In the first instance, although the Court must liberally construe a pro se litigant's submissions, see Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)); Vogt, 8 F.4th at 185 (explaining that courts must "remain flexible, especially 'when dealing with imprisoned pro se litigants . . .'" (quoting Mala, 704 F.3d at 244–45)), it cannot control how James organized his amended complaint, in which he asserted claims against nineteen Defendants. Nonetheless, to the extent that James attempted to assert that Bauer denied him access to the courts, see (Doc. No. 34 ¶ 45 ("Plaintiff submits Defendant Luscavage, Banuer [sic][,] and Noel despite notice through court order documentation demonstrated active deadlines upon which [P]laintiff requested reasonable access to the institutions law library and repeatedly denied such access being unlawfully removed or not placed on the law library list . . . ."), he failed to plead a plausible cause of action for a denial of access to the courts because even though he references his other civil (including habeas) and criminal cases at various points in his amended complaint, he never, inter alia, sufficiently pleads that he suffered an actual injury by "identify[ing] a nonfrivolous, arguable underlying [cause of action]" that he actually lost or that was being obstructed by the asserted denial of access to the courts. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) (internal citation and quotation marks omitted); see also Monroe v. Beard, 536 F.3d 198, 206 n.9 (3d Cir. 2008) (explaining that the prisoner-plaintiff must explain how their claims "may no longer be pursued as a result of defendant's actions"). Simply alleging that his other cases are/were not frivolous without describing the claims in detail is wholly insufficient. For instance, although James references a habeas petition he allegedly was going to

and arguing that his allegations are sufficient to plead viable causes of action against all Defendants, see (Doc. Nos. 79 ¶¶ 15, 21, 22; 79-1 ¶¶ 9, 11–14); and (4) mistakenly arguing that the "crux of [Defendants'] argument . . . is rooted within the belief that [his] verified complaint is defective," see (Doc. Nos. 79 ¶ 23; 79-1 ¶ 23).

James's failure to substantively address the Defendants' exhaustion argument effectively constitutes a waiver of any argument that he actually exhausted his administrative remedies as to his claims against DiNapoli and Green. See Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument."); Reilly v. Lehigh Valley Hosp., 519 F. App'x 759, 762 (3d Cir. 2013) (unpublished) (concluding that the plaintiff waived argument on appeal because, inter alia, he did not oppose the defendant's "summary judgment motion on th[at] ground in the District Court"); Brown v. Johnson, 116 F. App'x 342, 345 (3d Cir. 2004) (unpublished) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal"); Campbell v. Jefferson Univ. Physicians, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of th[o]se issues.'" (quoting Skirpan v. Pinnacle Health Hosps.,

---

file on July 17, 2019, see (Doc. No. 34 ¶ 37), it appears that he had already appealed from the denial of his fourth petition under Pennsylvania's Post Conviction Relief Act, see Commonwealth v. James, No. 1477 WDA 2018 (Pa. Super. Ct. Nov. 14, 2019) (unpublished) (noting fourth PCRA petition and indicating James's sentence was imposed in September 1996), and he already had filed a habeas petition under 28 U.S.C. § 2254, which was denied. See Docket, James v. Chesney, No. 02-cv-00995 (W.D. Pa. filed June 3, 2002), ECF Nos. 1, 16, pet. for certificate of appealability denied, James v. Chesney, No. 03-3125 (3d Cir.). As such, even if the Court had construed the amended complaint as containing an access to courts claim against Bauer, the Court would have dismissed it for failure to state a claim.

No. 07-cv-01703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)), report and recommendation adopted, 2010 WL 3632702 (M.D. Pa. Sept. 10, 2010)); Kosciolek v. Wilkes-Barre Fire Fighters Ass'n Loc. 104, No. 04-cv-01920, 2006 WL 3742700, at *3 n.1 (M.D. Pa. Dec. 18, 2006) ("Even if Plaintiff did raise these claims in his Amended Complaint, because he ignored them at summary judgment, they are deemed waived." (citing Scott v. Beard, No. 02-cv-00691, 2006 WL 2645150, at *4 (M.D. Pa. Sept. 14, 2006), aff'd, 252 F. App'x 491 (3d Cir. 2007) (unpublished))), aff'd sub nom. Turinski v. Loc. 104 Int'l Ass'n of Fire Fighters, 269 F. App'x 184 (3d Cir. 2008) (unpublished); see also Paskert v. Kemna-ASA Auto Plaza, Inc., 950 F.3d 535, 540 (8th Cir. 2020) ("The failure to oppose a basis for summary judgment constitutes waiver of that argument, because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." (citation and internal quotation marks omitted)). Nevertheless, even if the Court did not deem James to have waived opposition to Defendants' exhaustion argument, the record undisputably shows that he failed to exhaust his Eighth Amendment claims against DiNapoli and Green because he did not set forth facts placing prison officials on notice that he was asserting any claims, much less Eighth Amendment deliberate-indifference-to-serious-medical-needs and conditions-of-confinement claims, based on what transpired while he was inside the inmate's bathroom on July 17, 2019 when he filed Grievance No. 814321.[19]

[19] Because the Court concludes that James failed to exhaust his Eighth Amendment claims against DiNapoli and Greene in general, the Court will not separately address Defendants' argument that James failed to exhaust these claims because he failed to name them in Grievance No. 814321, even though they correctly point out that he failed to name them in it, see (Doc. No. 75-3 at 3–4), and none of the prison officials responding to the grievance or James's appeals from the denial of the grievance ever acknowledged DiNapoli or Green or otherwise addressed that James was asserting a claim against DiNapoli or Green.

The Court's review of Grievance No. 814321 shows that James never claims that anyone, including DiNapoli and Green, was deliberately indifferent to his serious medical needs by either failing to loosen his handcuffs or assist him with obtaining his inhaler while he remained in the inmate bathroom while the search of his cell occurred on July 17, 2019. See (Doc. No. 75-3 at 3–4). He also fails to allege that he was subjected to unconstitutional conditions of confinement while in the bathroom, and he did not name DiNapoli and Green as individuals who subjected him to unlawful conditions of confinement or were deliberately indifferent to his serious medical needs. See (id.). In fact, none of James's specific requests for relief are related to any individuals other than the CO Does. See (id. at 4).

The PLRA "requires 'inmates [to] provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.'" See Mack v. Warden Loretto FCI, 839 F.3d 286, 296 (3d Cir. 2016) (alteration in original) (quoting Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004)). "Restated slightly, an inmate's grievance must include facts sufficient to place prison officials on notice of the claim or claims to be investigated," Jackson v. O'Brien, No. 18-cv-00032, 2021 WL 5087922, at *6 (W.D. Pa. Nov. 2, 2021), and DC-ADM 804 requires a grievant to set forth "a statement of facts relevant to the claim" as well as "any claims [they] wish[] to make concerning violations of [DOC] directives, regulations, court orders, or other law." See DC-ADM 804 § 1.A.11.a, c; see also Spruill, 372 F.3d at 232 (explaining that the DOC requires that the grievance, inter alia, include "a statement of the facts relevant to the claim").

Here, James never identifies any facts in Grievance No. 814321 that would have placed prison officials on notice that he was asserting Eighth Amendment deliberate indifference to serious medical needs or conditions of confinement claims against anyone, including DiNapoli

and Green, pertaining to what transpired while he was in the inmate's bathroom. See (Doc. No. 75-3 at 3–4). Rather, he alleges only that he was handcuffed and, presumably while still handcuffed, placed in the inmate bathroom for "nearly 2 ½ hours while the search of [his] cell was conducted." See (id. at 4).[20] As such, James failed to exhaust his Eighth Amendment claims because he never identified any facts relevant to such claims in his grievance. See, e.g., Vo v. Wetzel, No. 22-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022) (unpublished) (concluding that the district court "properly found that [the prisoner-plaintiff] failed to exhaust her equal protection claim for the confiscation of her art portfolio" because even though the plaintiff's "grievance informed prison officials that her property had been confiscated in contravention of the prison's policies, . . . it did not alert them to any issue of disparate treatment"); Brown v. U.S. Justice Dep't, 271 F. App'x 142, 145–46 (3d Cir. 2008) (unpublished)

[20] Despite James not specifically asserting such a claim in his amended complaint, prison officials' use of handcuffs on an inmate could constitute an Eighth Amendment excessive force claim under certain circumstances. However, those circumstances are not present in this case because James does not identify any facts in his grievance that would have alerted prison officials that he was asserting an excessive force claim relating to his placement in handcuffs. See Whitley v. Albers, 475 U.S. 312, 319 (1986) (explaining that, in the prison context, only "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment" (citation and internal quotation marks omitted)); Robinson v. Danberg, 673 F. App'x 205, 211 (3d Cir. 2016) (unpublished) (indicating that a plaintiff asserting an excessive force claim against a correctional officer must show that the force was applied "'maliciously and sadistically for the very purpose of causing harm' instead of 'in a good faith effort to maintain or restore discipline.'" (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992))); see also Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (identifying several factors courts consider when determining whether a correctional officer used excessive force, including, inter alia: (1) "'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" (quoting Whitley, 475 U.S. at 322)). James admits he was placed in handcuffs only while his cell was searched, he does not allege that he suffered any injuries due to the handcuffs, he does not allege that he sought medical treatment following the incident, and he does not allege any lasting injury from the incident. At best, James described a de minimis use of force regarding the handcuffs in his grievance.

(agreeing with district court that prisoner-plaintiff's grievance "did not put Defendants on notice of a retaliatory transfer claim"); Quinn v. Palakovich, 204 F. App'x 116, 118 (3d Cir. 2006) (unpublished) (determining that prisoner-plaintiff's failure-to-protect claim against correctional officials was not exhausted where the plaintiff's grievance included "brief language about [his] slip-and-fall in the kitchen," which "serves only to describe the location of his injury to the personnel receiving his grievance about his medical treatment"); Jackson v. Mason, No. 22-cv-00845, 2025 WL 2809344, at *18 (M.D. Pa. Sept. 30, 2025) ("In the end, since Grievance No. 965217 did not alert prison officials or otherwise place them on fair notice that Jackson was asserting retaliation claims against Defendants, it did not 'initiate or exhaust Jackson's administrative remedies as to that claim.'" (quoting Jackson v. O'Brien, 2021 WL 5087922, at *6)), appeal dismissed, No. 25-3087, 2026 WL 1146278 (3d Cir. Jan. 28, 2026); Pew v. Little, No. 22-cv-01488, 2025 WL 2471780, at *4 (E.D. Pa. Aug. 27, 2025) ("While Pew's grievance alerted prison officials to his primary concern—that he had been denied an electric razor—Pew's grievance makes no reference to discrimination vis-à-vis other inmates."). Therefore, James's Eighth Amendment claims are procedurally defaulted unless the default can be excused.

An inmate can demonstrate that a procedural default resulting from their failure to specifically assert a claim in their initial grievance should be excused if they show that the DOC considered such a claim on appeal and denied it on its merits. See Spruill, 372 F.3d at 234 (concluding that the grievance officer's recognition that a certain defendant was involved the events at issue excused the prisoner-plaintiff's failure to name that defendant in the grievance). Here, James does not attempt to make such a showing, nor could he because neither the Initial Review Response, the Facility Manager's Appeal Response, nor SOIGA's Response demonstrate that prison officials considered him to have asserted Eighth Amendment claims

based on what transpired while he was in the inmate's bathroom. See (Doc. No. 75-3 at 2, 5, 8). Accordingly, there is no basis upon which to excuse James's procedural default of his Eighth Amendment claims against DiNapoli and Green.[21]

**(2) Merits**

Assuming, arguendo, that James exhausted his Eighth Amendment conditions-of-confinement claim,[22] DiNapoli and Green have met their burden of showing that they are entitled to summary judgment in their favor on this claim. James's conditions-of-confinement claim is governed by the Eighth Amendment. See Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005). In general, "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" See Porter v. Pa. Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020)

---

[21] The Court notes that in James's Appeal to the Facility Manager, he describes the conditions inside the bathroom for the first time when he states that the bathroom was "dirty" and "urine infested," and he also states for the first time that he was "handcuffed behind his back" while he was in the bathroom. See (id. at 6). The fact that James states that he was "handcuffed behind his back" would not have placed prison officials on notice that he was alleging that those handcuffs were excessively tight on him or otherwise causing him physical distress. Additionally, even if James's references to the alleged conditions of the bathroom could be considered as placing the Facility Manager (McGinley) on notice that he was complaining about the conditions of his confinement in the bathroom, McGinley never addressed them in his Facility Manager Appeal Response, see (id. at 8), and James he never mentions these conditions in his appeal to SOIGA. Instead, he merely states in his SOIGA appeal that he was locked in the bathroom "cuffed for hours" without specifying the conditions of the bathroom. See (id. at 11).

[22] The Court will not undergo this alternative analysis for James's deliberate-indifference-to-serious-medical-needs claim because he never presented such a claim at any point in his grievance or subsequent appeals. On the other hand, because, as noted supra, James mentioned certain conditions of his experience in the inmate's bathroom in his Appeal to Facility Manager, the Court will conduct this alternative analysis regarding his conditions of confinement claim for sake of completeness.

(quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). This showing means that plaintiffs such as James must satisfy both an objective and subjective prong akin to Eighth Amendment excessive force claims. See Ricks v. Shover, 891 F.3d 468, 475 (3d Cir. 2018).

To satisfy the objective prong of this test,

> the deprivation alleged must be, objectively, sufficiently serious, resulting in the denial of the minimal civilized measure of life's necessities. Although the Eighth Amendment does not mandate comfortable prisons, prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care. In a challenge to those conditions, the inmate must show that [they are] incarcerated under conditions posing a substantial risk of serious harm. However, [t]he proof necessary to show that there was a substantial risk of harm is less demanding than the proof needed to show that there was a probable risk of harm.

See Mammana v. Fed. Bureau of Prisons, 934 F.3d 368, 372–73 (3d Cir. 2019) (internal quotation marks and footnotes omitted) (quoting Farmer, 511 U.S. at 834). Only "extreme deprivations" are sufficient to make out a conditions-of-confinement claim. See Hudson, 503 U.S. at 8–9. Thus, it is insufficient for a plaintiff to show that they were merely uncomfortable. See id. Rather, as already stated, the plaintiff must demonstrate that the conditions of their confinement posed a "substantial risk of serious harm" to their health or safety. See id. (quoting Farmer, 511 U.S. at 834).

To satisfy the subjective prong of the Eighth Amendment test, the plaintiff must allege and show that the defendant prison official had a "sufficiently culpable state of mind." See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015). "In prison-condition cases that state of mind is one of 'deliberate indifference' to inmate health or safety . . . ." Farmer, 511 U.S at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302–03 (1991)). This requires a plaintiff to show that the defendant prison official "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety . . . meaning that the official must actually [have been] aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." See Woloszyn v.

County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005) (omission in original) (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)). The plaintiff "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010) (citation and internal quotation marks omitted). In evaluating the subjective prong of the Eighth Amendment test, courts also should consider whether officials "had a legitimate penological purpose" behind their conduct. See Ricks, 891 F.3d at 475. Overall, the Court must conduct "a totality-of-the-circumstances analysis" and should consider the duration and severity of the allegedly unconstitutional conditions. See McClure v. Haste, 820 F. App'x 125, 128 (3d Cir. 2020) (unpublished).

Here, the Court initially notes that James acknowledged during his deposition that neither DiNapoli nor Green were responsible for handcuffing him or placing/locking him in the inmate's bathroom. As such, his conditions-of-confinement claim sounds more in the nature of a failure to intervene claim. "To prevail on a failure to intervene claim, a plaintiff must show: (1) that the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene." Balliet v. Luzerne County, No. 22-cv-02032, 2024 WL 2275252, at *8 (M.D. Pa. May 20, 2024) (citations and internal quotation marks omitted). "[T]he duration of the incident is key to determining whether there was a reasonable opportunity [to intervene]." El v. City of Pittsburgh, 975 F.3d 327, 335 (3d Cir. 2020) (citing Ricks, 891 F.3d at 479).

James fails to show that DiNapoli and Green failed to intervene because there was no constitutional violation which occurred in their presence insofar as James was not subjected to

unconstitutional conditions of confinement. James asserts that he was subjected to unlawful conditions of confinement during the two hours he was in the inmate's bathroom on July 17, 2019. During his time in this bathroom, James allegedly was in tight handcuffs and handcuffed behind his back, he could not relieve himself because of his restraints, the bathroom smelled of urine and was extremely hot, and he was having some difficulty breathing.

As for the bathroom smelling of urine and being extremely hot, James's testimony is insufficient to show that he suffered an objectively, sufficiently serious deprivation resulting in the denial of minimal civilized measure of life's necessities. Although "[u]nsanitary conditions can be cruel and unusual," see Allah v. Bartkowski, 574 F. App'x 135, 138 (3d Cir. 2014) (unpublished) (citing Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992)), courts have continually concluded that plaintiffs failed to show a serious deprivation under worse conditions endured for significantly longer periods. See Farmer, 511 U.S. at 833–34 (explaining that prison conditions may be harsh and uncomfortable without rising to the level of a constitutional violation); see, e.g., Wheeler v. Walker, 303 F. App'x 365, 368 (7th Cir. 2008) (unpublished) (rejecting Eighth Amendment claim where prisoner failed to allege serious harm from two-week period where he had only thin blanket to protect him from frigid area entering unheated cell through window with broken latches, roaches crawled over him while he tried to sleep on badly torn mattress, urine and waste "encrusted" sink and toilet, trash, dirt, and debris covered floors, walls, and sink, and stench of waste came from broken toilet); Marinelli v. Sorber, No. 22-cv-02401, 2022 WL 4280476, at *5 (E.D. Pa. Sept. 15, 2022) (concluding that plaintiff failed to establish an Eighth Amendment violation due to the lack of air conditioning for sixteen days and plaintiff failed to allege he suffered any physical injury). Similarly, although James alleges that he could not use the bathroom and was restrained by overly tight handcuffs, his discomfort for an

insubstantial period does not give rise to an Eighth Amendment claim. Notably, James also does not allege (and did not testify) that his need to relieve himself became so substantial that he relieved himself anyway, that he suffered any physical injury due to the allegedly tight handcuffs or his inability to use the bathroom, or that he sought any medical attention immediately following his release from the bathroom or over the days thereafter due to his inability to relieve himself or the tight handcuffs.

As for his need for an inhaler, James also does not point to any evidence showing that he was in distress due to his breathing issues, i.e., he did not suffer an asthma attack, see (Doc. No. 75-7 at 98, 99, 101), and he did not seek medical attention for his alleged breathing difficulties after he was returned to his cell. See (Doc. No. 75 ¶ 74 (citing Doc. No. 75-6 at 624–31)). Overall, none of the conditions James complains about resulted in a serious deprivation of his basic human needs. Moreover, although the Court recognizes that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." See Wilson, 501 U.S. at 304 (emphasis omitted); Young v. Ferguson, No. 18-cv-00879, 2020 WL 1505683, at *6–7 (M.D. Pa. Mar. 30, 2020) ("Although a combination of confinement conditions—considered alone constitutionally insufficient—may present an Eighth Amendment violation, they nevertheless must cumulatively produce 'the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" (quoting Wilson, 501 U.S. at 304)), aff'd, 830 F. App'x 375 (3d Cir. 2020) (unpublished)), the conditions of confinement James alleges here, even in combination, do not support a viable Eighth Amendment conditions-of-confinement claim because they are not so reprehensible as to be deemed inhumane under contemporary

standards and did not deprive James of the minimal civilized measures of the necessities of life.[23] Accordingly, the Court will grant Defendants' motion for summary judgment as to James's Eighth Amendment claims against DiNapoli and Green.

### 2. James's First Amendment Retaliation Claim Against Belles

Defendants argue that Belles is entitled to summary judgment on James's First Amendment retaliation claim against him because (1) the statute of limitations bars James's claim to the extent he asserts that Belles retaliated against him by filing a false misconduct charge against him in May 2017 and (2) he cannot establish a prima facie retaliation claim against Belles. See (Doc. No. 76 at 18–32). The Court agrees with Defendants that the statute of limitations bars James's retaliation claim to the extent he bases it on Belles's issuance of a misconduct in May 2017. In addition, to the extent that James alleges in his amended complaint that Belles retaliated against him by arranging for the search of his cell on July 17, 2019, the Court will dismiss this claim for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii).[24]

---

[23] Even if James had satisfied the objective part of the Eighth Amendment test, DiNapoli and Green would still be entitled to summary judgment because James fails to identify any evidence showing that DiNapoli and Green acted with deliberate indifference, which exposed him to a substantial risk of serious damage to his future health.

[24] During his deposition, James explained that his retaliation claim had two parts: (1) Belles's issuance of a "false or retaliatory misconduct" in May 2017; and (2) Belles's retaliation by initiating the cell search in July 2019. See (Doc. No. 75-7 at 22). Regarding this latter retaliation claim, the Court had not previously construed the amended complaint as containing such a claim in large part because James never identified the date Belles issued the misconduct in the amended complaint, see (Doc. No. 54 at 36 (indicating that James's "First Amendment retaliation claim against . . . Belles based on the issuance of a 'false retaliatory misconduct'" was proceeding forward)), and Defendants never addressed this claim in their summary judgment submissions. See (Doc. No. 76 at 19–32).

### a. Factual Record[25]

James alleges that Belles issued a false misconduct against him in retaliation for James previously filing grievances and complaints against him and fellow SCI Coal Twp. staff members. See (Doc. No. 75 ¶ 38 (citing Doc. No. 31 ¶¶ 34–36)). James never specifies in his amended complaint when Belles allegedly issued this false misconduct charge, see (id. ¶ 39); however, the events forming the basis of James's claim occurred in May 2017. See (id. ¶ 40 (citing Doc. Nos. 75-2 at 2; 75-4 at 75-4 at 7–8; 75-5 at 1)); see also (Doc. No. 75-7 at 43 (testifying that the incident date was May 8, 2017, and the misconduct report was issued on May 9, 2017). James did not file his original complaint in this case until June 17, 2021. See (id. ¶ 41 (citing Doc. No. 1)).

Regarding the search of his cell on July 17, 2019, James testified that it was his "understanding that . . . Belles was probably the one that orchestrated the search of my cell." See (Doc. No. 75-7 at 22). James also testified that he "believe[s]" that one of the four officers who came to search his cell "might have stated it was [an] investigative [search] and that he was sent by Belles." See (id. at 85); see also (id. at 86 (testifying that the officer James believed was a rookie officer "said that they were sent by . . . or I think, however, I can't remember exactly how I said it. I know he mentioned Belles, whether you know, the exact terminology, I can't remember, but that's how I became aware of the type of search that was being implemented"). James also believes that it was an investigative search, and he had never been subjected to such a search in the past at SCI Coal Twp. See (id. at 83–87, 89–90).

---

[25] Due to the way the Court will resolve James's First Amendment claims, the Court will not recite the facts leading up to Belles's issuance of the misconduct charge in May 2017, as well as most of the facts referenced in Defendants' summary judgment submission and James's deposition testimony about what transpired with James's misconduct proceedings and separate grievance proceedings.

**b. Analysis**

Starting with Defendants' statute of limitations argument, James's Section 1983 First Amendment retaliation claim against Belles is subject to the applicable state's statute of limitations for personal injury actions. See Wallace v. Kato, 549 U.S. 384, 387 (2007) (concluding that statute of limitations for section 1983 actions "is governed by the personal injury tort law of the state where the cause of action arose"). Since James's claim arose in Pennsylvania, the Court applies Pennsylvania's relevant limitations period, which is two years. See Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017) (stating that "[t]he statute of limitations applicable to § 1983 claims in Pennsylvania is two years" (citation omitted)). The two-year limitations period accrues "when a plaintiff has a complete and present cause of action, that is, when [the plaintiff] can file suit and obtain relief." See Dique v. N.J. State Police, 603 F.3d 181, 185 (3d Cir. 2010) (quotation marks and citation omitted). This means that the statute of limitations generally "accrues when the plaintiff knew or should have known of the injury upon which [the] action is based." See Sameric Corp. of Del., Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998).

Here, James's First Amendment retaliation claim based on Belles issuing him an allegedly false misconduct accrued on May 9, 2017, the date the misconduct was issued. See (Doc. No. 75-5 (showing date of misconduct report as "5/9/17"); O'Connor v. City of Newark, 440 F.3d 125, 129 (3d Cir. 2006) (concluding that Section 1983 claim for First Amendment retaliation accrues at the time of the discrete retaliatory act). As such, James had until no later than May 9, 2019, to file a complaint raising a retaliation claim against Belles. James did not assert this claim until filing his complaint in this case on June 17, 2021, which was almost two

years after the statute of limitations expired. Thus, it appears that the statute of limitations bars James's retaliation claim.

James never substantively addresses Defendants' statute-of-limitations argument in his summary judgment opposition. Instead, he merely makes two passing references that the continuing violations doctrine applies, without substantively explaining how the evidence in the summary judgment record warrant application of the doctrine to his case. See (Doc. No. 79 ¶ 24 ("Plaintiff avers his claims against . . . Belles are timely pursuant to the continuing violations doctrine. Plaintiff submits his verified complaint pleads factual material facts showing Defendants [sic] continued violation of [his] constitutional rights . . . ."); 79-1 ¶ 7 (asserting that he "adequately plead[ed] cause [sic] of action against both Executive and Corrections Defendants for subjection of [him] to . . . retaliation . . ., and that the continuing violations doctrine applies)). James's failure to substantively address Defendants' argument other than by two passing references to the continuing violations doctrine is wholly insufficient to support the Court applying the doctrine here.

Nevertheless, even if the Court considered whether the continuing violations doctrine should apply here, the Court would conclude that it does not apply. The continuing-violations doctrine is an "equitable exception to the timely filing requirement," which permits a court to toll the statute of limitations if a defendant's conduct constitutes a "continuing violation." See Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)). This "equitable exception" applies "when a defendant's conduct is part of a continuing practice," and "an action is [deemed] timely so long as the last act

evidencing the continuing practice falls within the limitations period . . . ." See id. (citations and quotation marks omitted).

The continuing-violations doctrine does not toll the statute of limitations based solely on "the occurrence of isolated or sporadic acts." See id. (citation and quotation marks omitted). As such, "[t]he Court must consider carefully the distinction between 'continuing violations' and 'discrete acts.'" See Anders v. Bucks County, No. 13-cv-05517, 2014 WL 1924114, at *4 (E.D. Pa. May 12, 2014) (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)). Each "discrete act" "starts a new clock for filing charges alleging that act." See Hunt v. Pa. Dep't of Corr., 289 F. App'x 507, 509 (3d Cir. 2008) (unpublished) (citations and quotation marks omitted). For example, the continuing-violations doctrine does not apply to a Section 1983 deliberate-indifference claim merely because the plaintiff continues to suffer pain from an initial failure to provide medical treatment. See Hickox v. County of Blair, 591 F. App'x 107, 110, 111 (3d Cir. 2014) (unpublished) (concluding that the continuing-violation exception to limitations bar was inapplicable because it "refers to continual unlawful acts [by the defendant], not continual ill effects from an original violation" (alteration in original) (citations and quotation marks omitted)). In the end, a court considers at least two factors when determining "whether to apply the continuing violations doctrine: (1) whether the violations were related in subject matter and (2) whether the acts were recurring." See Alexis v. Connors, No. 23-2502, 2024 WL 3534480, at *4 (3d Cir. July 25, 2024) (unpublished) (citing Cowell, 263 F.3d at 292).[26]

---

[26] In Cowell, the Third Circuit Court of Appeals indicated that a plaintiff seeking application of the continuing violations doctrine must satisfy three factors:

> (1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should

Here, although James generally complains in his amended complaint about a wide-ranging conspiracy and suffering retaliation, he fails to identify a single allegedly retaliatory act by Belles that occurred between the issuance of the misconduct on May 9, 2017, and the search of his cell on July 17, 2019. He also never identified any such acts during his deposition. See (Doc. No. 75-7 at 26–61). Therefore, there are no events upon which to consider applying the continuing violations doctrine, especially considering that Belles's issuance of a misconduct charge on May 9, 2017, was a discrete act upon which James, who was no stranger to filing civil rights actions even at that time according to the allegations in his amended complaint, should have been aware of his ability to file a claim. In fact, James filed a grievance raising a retaliation claim against Belles based on this conduct. See (Doc. No. 75-4 at 8–9). He just never filed a timely lawsuit asserting his retaliation claim after exhausting his administrative remedies as to

> trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. The consideration of "degree of permanence" is the most important of the factors.

See 263 F.3d at 292 (internal citations omitted). However, in a decision more than a decade later, the Third Circuit concluded that "permanency is not required to establish a continuing violation" following the United States Supreme Court's decision in Morgan in 2002. See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 166 (3d Cir. 2013).

This Court could not locate a Third Circuit decision clarifying whether the continuing-violations doctrine encompasses three factors as explained in Cowell or two factors as explained in Mandel. Moreover, both Cowell and Mandel were binding panel decisions, and pursuant to "Third Circuit precedent and internal operating procedure, a panel of the Third Circuit 'cannot overrule an earlier binding panel decision; only the entire court sitting en banc can do so.'" See Al Haj v. LSCI-Allenwood Warden, No. 24-cv-01193, 2025 WL 1115751, at *3 (M.D. Pa. Apr. 15, 2025) (citing Chester ex rel. N.L.R.B. v. Grane Healthcare Co., 666 F.3d 87, 94 (3d Cir. 2011) and Third Circuit I.O.P. 9.1)). Thus, both Cowell and Mandel remain binding, and the Third Circuit has issued decisions after Mandel that follow it and Cowell by discussing that there are two or three applicable factors when analyzing whether the continuing-violations doctrine applied. Compare Alexis, 2024 WL 3534480, at *4 (identifying two factors), with Beckett v. Pa. Dep't of Corr., 597 F. App'x 665, 667–68 (3d Cir. 2015) (unpublished) (identifying three factors).

the claim. See (Doc. No. 75-2 at 2 (indicating that James pursued his grievance raising a retaliation claim to final review with SOIGA)). Accordingly, the continuing violations doctrine does not apply to James's retaliation claim against Belles, and, thus, Belles is entitled to summary judgment on James's First Amendment retaliation claim to the extent that James bases it on Belles's issuance of a misconduct on May 9, 2017.

As for James's other retaliation claim, i.e., that Belles retaliated against James for filing a grievance related to the issuance of the May 9, 2017 misconduct by directing the CO Does to conduct an unwarranted investigative cell search on July 17, 2019, Defendants do not address this claim in their motion for summary judgment. Nevertheless, in cases in which a plaintiff, like James, is proceeding in forma pauperis, a court must dismiss a case "at any time if the court determines that . . . (B) the action . . . (ii) fails to state a claim on which relief may be granted." See 28 U.S.C. § 1915(e)(2)(B)(ii). James's remaining retaliation claim against Belles falls within the type of claim that this Court must dismiss because he fails to state a claim upon which relief may be granted.

To plead a prima facie First Amendment retaliation claim, a plaintiff must allege that: "(1) [their] conduct was constitutionally protected; (2) [they] suffered an adverse action at the hands of prison officials; and (3) [their] constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [them]." See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted). As for the first element of a plaintiff's prima facie case, the filing of lawsuits and prison grievances constitutes activity protected by the First Amendment. See id. (reiterating prior holding that a prisoner-plaintiff engages in constitutionally protected activity when they file a grievance against a prison official (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003))); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (acknowledging

its prior holding "that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts" (citation omitted)); Allah v. Seiverling, 229 F.3d 220, 223–25 (3d Cir. 2000) (concluding that the prisoner-plaintiff stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials).

Regarding the second element of a plaintiff's prima facie case, an adverse action is one that is "sufficient to deter a person of ordinary firmness from exercising [their] [constitutional] rights[.]" See Mitchell, 318 F.3d at 530 (second alteration in original) (citations and internal quotation marks omitted); Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015) (explaining that an adverse action must be "sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights . . ." (citation omitted)). However, to be actionable under Section 1983, the alleged adverse action must be more than de minimis. See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct "need not be great in order to be actionable, but it must be more than de minimis" (citations and internal quotation marks omitted)).

Finally, with respect to the third element of a plaintiff's prima facie case, the Court observes that, "[b]ecause motivation is almost never subject to proof by direct evidence," a plaintiff must typically "rely on circumstantial evidence to prove a retaliatory motive." See Watson, 834 F.3d at 422. The plaintiff "can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."

See id. (footnote omitted).[27] "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (quoting Farrell, 206 F.3d at 281); see also Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (pointing out that circumstantial evidence may include "inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole").

For purposes of this analysis, the Court presumes that James establishes the first two elements of a prima facie case insofar as he alleges that Belles retaliated against him because he filed a grievance against him in May 2017,[28] and he suffered an adverse action insofar as his cell was searched and certain property was allegedly confiscated. However, James's retaliation claim fails at the third element.

---

[27] In addressing whether a plaintiff has sufficiently pleaded/shown that there was an unusually suggestive temporal proximity in the First Amendment context, "[t]he causation required to establish a [First Amendment retaliation] claim under § 1983 is identical to that required under Title VII." See Brennan v. Norton, 350 F.3d 399, 420 (3d Cir. 2003); see also Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) ("We recognized in Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000), that suggestive timing is relevant to causation in Title VII retaliation cases, and we recently cited Farrell in a prisoner's First Amendment retaliation case in support of the proposition that 'suggestive temporal proximity' is relevant to establishing a causal link between protected conduct and retaliatory action." (citing Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001)).

[28] The Court takes judicial notice that the protected activity James alleges formed the basis of Belles's retaliatory action occurred in May 2017, when James filed a grievance against Belles in part due to his allegedly retaliatory issuance of a false misconduct against James. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (noting that, when considering dismissal at the pleading stage, a court may take judicial notice of a "document integral to or explicitly relied upon in the complaint" (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997))). The Court also notes that both parties have submitted copies of this grievance in their submissions. See (Doc. Nos. 75-4 at 8–9; 80-2 at 2–3).

James never alleges in his amended complaint that anyone, including Belles, told James that the cell search was ordered in retaliation for James filing a grievance against Belles. As such, James must show either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." See Watson, 834 F.3d at 422. James fails to sufficiently allege either option in this case.

Starting with the temporal proximity between the protected activity—the filing of the grievance in May 2017—and the alleged retaliatory action—the ordering of an investigative search of James's cell in July 2019, the Court notes that "there is no bright line rule as to what constitutes unduly suggestive temporal proximity." See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007)); see also Conard v. Pa. State Police, 902 F.3d 178, 184 (3d Cir. 2018) ("[T]here is not a bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant."). Additionally, even though the "'mere passage of time is not legally conclusive proof against retaliation,' . . . the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." See Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000). Nevertheless, "[a]n inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action." See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 221 (3d Cir. 2017) (citing LeBoon, 503 F.3d at 233); see also Qin v. Vertex, Inc., 100 F.4th 458, 477 (3d Cir. 2024) (rejecting the district court's "adoption of a rigid three-week time frame as part of the temporal proximity inquiry" because it was "a shorter 'unduly suggestive' time frame" than the three-

month time frame identified in Moody, and concluding that the plaintiff's complaint about his performance review to HR and his termination six weeks later was "well within the three-month range to be 'unusually suggestive of retaliatory motive' [and a] jury could find that the proximity between [plaintiff's] complaint to HR and his termination is enough to infer causation." (citing Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004))).

Here, the gap of time between James's protected activity and the alleged retaliatory action is more than two years. Therefore, the timing of Belles's allegedly retaliatory action in ordering the investigative search of James's cell is not unusually suggestive of a retaliatory motive for this Court to infer causation. See, e.g., Watson, 834 F.3d at 423 ("[T]he timing between the prior suit against Dupont in 2009 and the confiscation of Watson's radio two years later is just too remote to suggest a retaliatory motive here."); Ituah v. City of Philadelphia, No. 23-3140, 2024 WL 3177770, at *2 (3d Cir. June 26, 2024) (unpublished) ("Although Thurmond was personally involved in Ituah's 2020 bankruptcy proceeding, wherein she filed run-of-the-mill claims and objections on behalf of the City, all of those actions took place almost two years after Ituah's 2018 filing. Ituah thus failed to provide evidence of an 'unusually suggestive temporal proximity' establishing a retaliatory motive . . . ."); Grant v. U.S. Postal Office, No. 22-2933, 2023 WL 3816524, at *2 (3d Cir. June 5, 2023) (unpublished) ("We agree with the District Court that the passage of approximately two years between Grant's filing her EEOC complaint in November 2011 and her termination in 2013 is not unduly suggestive of retaliation.") Scrip v. Seneca, 651 F. App'x 107, 111 (3d Cir. 2016) (unpublished) ("Scrip cannot win based on temporal proximity alone. . . . Using the most generous calculation [of the period between when Appellees became aware of Scrip's letters and the termination of his employment], there were at least seventeen months between the Appellees' awareness of his speech and his termination, a

time period that does not support an inference of causation."); Randolph- Ali v. Steelton Police Dep't, No. 16-cv-01625, 2017 WL 192157, at *1 n.1 (M.D. Pa. Jan. 18, 2017) ("The two-year time lapse is not so 'unduly suggestive' as to independently prove causation . . . ." (citing Lauren W. ex rel. Jean W., 480 F.3d at 267)).

Because James fails to show an unduly suggestive temporal proximity, he needs to plead facts showing "a pattern of antagonism coupled with timing that suggests a causal link." See Watson, 834 F.3d at 422. James fails to do that in his amended complaint. Other than his general allegations of retaliatory behavior (which he asserts against all Defendants named in his amended complaint), he does not allege any facts showing that Belles had a pattern of antagonism towards him that, when coupled with the timing of the search, suggests a causal link.[29] Therefore, he also fails to satisfy the second possible avenue upon which he could plausibly plead causation. Accordingly, the Court will dismiss James's First Amendment retaliation claim against Belles to the extent it is based on Belles allegedly ordering the investigative search of James's Cell on July 17, 2019.[30]

---

[29] Moreover, to the extent relevant in a general sense, James identified no such facts during his deposition or in any other filing he submitted in this matter.

[30] Having determined that this First Amendment retaliation claim is subject to dismissal, the Court must determine whether to grant James leave to file a second amended complaint. Courts should generally give leave to amend but may dismiss a complaint with prejudice where leave to amend would be inequitable or futile. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile."). Here, the Court finds that granting leave to James to file a second amended complaint would be futile because he already had an opportunity to amend his complaint and his failure to introduce evidence in support of his claim through the approximately five years that this action has been pending.

### 3. James's Claims for Violations of the Pennsylvania Constitution

James also has a pending claim for violations of the Pennsylvania Constitution against Belles, DiNapoli, and Green. However, due to the Court's resolution of James's Section 1983 claim, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over his state-law claims. See 28 U.S.C. 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so"). The Court finds that consideration of "judicial economy, convenience, and fairness to the parties" does not "provide an affirmative justification" for retaining jurisdiction over James's claims for violations of the Pennsylvania Constitution. See Hedges, 204 F.3d at 123. Accordingly, the Court will decline to exercise supplemental jurisdiction over James's state-law claims and dismiss them without prejudice to him refiling them in the appropriate Pennsylvania state court.[31]

[31] There is also no independent basis for jurisdiction over this state-law claim pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332(a), because James does not sufficiently allege the citizenship of the parties insofar as he pleads only his place of incarceration and Defendants' places of employment. See Washington v. Hovensa LLC, 652 F.3d 340, 344 (3d Cir. 2011) (stating that an individual is a citizen of the state where they are domiciled, meaning the state where they are physically present and intend to remain indefinitely); Pierro v. Kugel, 386 F. App'x 308, 309 (3d Cir. 2010) (unpublished) ("[T]he domicile of a prisoner before [their] imprisonment presumptively remains [their] domicile during [their] imprisonment."). It also appears from his extensive litigation history that James resided in Pennsylvania prior to his incarceration, and Defendants' place of employment suggests that some, if not all of Defendants, may be Pennsylvania citizens. See Lincoln Ben. Life Co. v. AEI Life, LLC, 800 F.3d 99, 104 (3d

## IV. CONCLUSION

For the reasons set forth above, the Court will: (1) deem withdrawn James's motion to compel to the extent such a motion is included in his "Memorandum of Law in Support of [His] Motion to Show Cause/and Compel Complete Discovery Response [sic] Production of Documents"; (2) dismiss with prejudice James's remaining claims against the CO Does for his failure to name/identify them during discovery; (3) deem withdrawn James's cross-motion for summary judgment; (4) deem withdrawn any other motion possibly contained within James's cross-motion for summary judgment, except to the extent that James moves for appointment of counsel; (5) deny James's motion for appointment of counsel; (6) grant Defendants' motion for summary judgment to the extent that they seek summary judgment on James's Eighth Amendment claims against DiNapoli and Green as well as his First Amendment retaliation claim against Belles to the extent it is based on Belles issuing James a misconduct in May 2017; (7) dismiss with prejudice James's First Amendment retaliation claim against Belles to the extent it is based on Belles allegedly retaliating against James by directing the CO Does to conduct an investigatory cell search; (8) decline to exercise supplemental jurisdiction over James's state-law claims and dismiss those claims without prejudice to James refiling them in the appropriate state court; and (9) direct the Clerk of Court to close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

Cir. 2015) (explaining that Section 1332(a) requires "complete diversity between all plaintiffs and all defendants," meaning that "no plaintiff may be a citizen of the same state as any defendant" (citations, internal quotation marks, and alterations omitted)).